**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**BLUE WOLF CAPITAL MANAGEMENT LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

PHIL1 665104-17

Table of Contents

Page

SECTION 1.    THE COMPANY ...........................................................................1

1.1.    Name .....................................................................................................1
1.2.    Principal Office of the Company ...........................................................1
1.3.    Registered Office and Agent .................................................................1
1.4.    Purpose ..................................................................................................1
1.5.    Statutory Compliance ............................................................................2
1.6.    Title to Property ....................................................................................2
1.7.    Duration .................................................................................................2
1.8.    Qualification in Other Jurisdictions ......................................................2
1.9.    Definitions: ...........................................................................................2

SECTION 2.    CAPITAL CONTRIBUTIONS AND STATUS OF PARTNERS .......9

2.1.    Common Member Capital Contributions and Admission. .....................9
2.2.    Preferred Member Capital Contributions and Admission .....................9
2.3.    Failure to Make Capital Contributions. .................................................9
2.4.    No Rights To Demand Return of Capital Contribution .......................10
2.5.    Liabilities of Members ........................................................................10
2.6.    Additional Obligations ........................................................................10

SECTION 3.    COMPANY INVESTMENT ACTIVITIES ...................................10

3.1.    Pre-Fund Investment Activities ..........................................................10
3.2.    First Close ...........................................................................................11
3.3.    Cessation of First Fund Establishment Activities ...............................11
3.4.    JNC Capital Commitments to First Fund ............................................11
3.5.    Co-Investment Rights ..........................................................................12
3.6.    Successor Fund ....................................................................................12
3.7.    AB/JWP Departure. .............................................................................12
3.8.    Reviews ................................................................................................13
3.9.    Capital Company .................................................................................14

SECTION 4.    CAPITAL ACCOUNTS, ALLOCATION OF INCOME AND LOSS ..........14

4.1.    Allocation of Net Income or Net Loss Generally. ..............................14
4.2.    Regulatory Allocations. .......................................................................15
4.3.    Tax Allocations ...................................................................................16
4.4.    Transfer of Interest ..............................................................................16
4.5.    Capital Account Maintenance .............................................................16
4.6.    Safe Harbor Election ...........................................................................16

SECTION 5.    DISTRIBUTIONS .......................................................................17

5.1.    Tax Distributions .................................................................................17
5.2.    Timing of Distributions .......................................................................17
5.3.    Priority of Distributions ......................................................................18
5.4.    Special JNC Distributions ...................................................................18
5.5.    Distributions on Dissolution ...............................................................19
5.6.    Taxes Withheld ....................................................................................19

Table of Contents

                                                                                    Page

SECTION 6.    ACCOUNTING AND RECORDS ...................................................20

6.1.    Books and Records ...................................................................................20
6.2.    Reports .....................................................................................................20
6.3.    Tax Returns ..............................................................................................21
6.4.    Tax Matters Partner ..................................................................................21
6.5.    Fiscal Year; Accounting Method ..............................................................21
6.6.    Bank Accounts ..........................................................................................21

SECTION 7.    MANAGEMENT AND OPERATIONS; COMPENSATION ............................21

7.1.    Board of Managers ....................................................................................21
7.2.    Day-to-Day Operations .............................................................................22
7.3.    Removal and Resignation of the Managers. .............................................24
7.4.    Budget .......................................................................................................25
7.5.    Major Decisions ........................................................................................25
7.6.    Restrictions on the Managers ...................................................................26
7.7.    Persons Dealing with Members or Managers. ..........................................26
7.8.    Other Business; Confidentiality, Non-Compete. .....................................27
7.9.    Exculpation and Indemnification of Covered Persons .............................30
7.10.   Compensation of the Members and Managers ..........................................31
7.11.   Voting Rights ............................................................................................32

SECTION 8.    MEMBERS ......................................................................................32

8.1.    Admission of New Members. ....................................................................32
8.2.    Participation in Management ....................................................................32
8.3.    No Authority to Act ..................................................................................32
8.4.    Death or Disability of a Member ..............................................................32
8.5.    Transfer of Member Interest. ....................................................................32

SECTION 9.    DISSOLUTION, LIQUIDATION AND TERMINATION OF THE COMPANY 34

9.1.    Events Causing Dissolution ......................................................................34
9.2.    Liquidation. ...............................................................................................34

SECTION 10.   AMENDMENTS ................................................................................35

10.1.   Amendments Generally .............................................................................35
10.2.   Filing Amendments. ..................................................................................35

SECTION 11.   CONSENTS, VOTING AND MEETINGS ..............................................35

11.1.   Method of Giving Consent ........................................................................35

SECTION 12.   REPRESENTATIONS AND WARRANTIES ...........................................36

12.1.   Representations and Warranties by the Members .....................................36
12.2.   Representations and Warranties Concerning the Transaction. ..................36
12.3.   Representations and Warranties of JNC ...................................................37
12.4.   Representations and Warranties Concerning the Company .......................37
12.5.   Organization, Qualification, and Power ....................................................37

-ii-

Table of Contents

Page

SECTION 13.   MISCELLANEOUS ........................................................................38

13.1.   Notices ..........................................................................................38
13.2.   Use of Company Name. ................................................................39
13.3.   Headings .......................................................................................39
13.4.   Severability ..................................................................................39
13.5.   Governing Law .............................................................................39
13.6.   Incorporation by Reference..........................................................39
13.7.   Additional Documents ..................................................................39
13.8.   Counterpart Execution ..................................................................39
13.9.   Entire Agreement. .........................................................................39
13.10.  Board of Director Approval ..........................................................39
13.11.  Suspensive Condition....................................................................40

Schedule of Members

Schedule 3.1  —  Investment Company Distributions

Schedule 3.2  —  Fund Distributions

Exhibit 7.4  —  2006 Budget

Compensation Schedule

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**BLUE WOLF CAPITAL MANAGEMENT LLC**
**A DELAWARE LIMITED LIABILITY COMPANY**

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF Blue Wolf Capital Management LLC, dated as of June 14, 2006 and effective as of April 1, 2006, by and among Adam M. Blumenthal ("AB"), Josh A. Wolf-Powers ("JWP"), and Johnnic Holdings Limited or one of its Affiliates as designated by Johnnic Holdings Limited ("JNC"), as the members of the Company. Definitions of certain terms used in this Agreement are contained in Section 1.9.

WHEREAS, the Company was formed on May 17, 2005; and

WHEREAS, AB and JWP (the "Original Members") entered into a limited liability company agreement effective as of May 17, 2005 (the "Original Agreement"); and

WHEREAS, the Original Members desire to admit JNC as an additional member of the Company; and

WHEREAS, the parties desire that the Original Agreement be amended and replaced in its entirety by the terms and conditions of this Agreement.

NOW, THEREFORE, the parties hereto, intending to be legally bound, hereby agree as follows:

**SECTION 1. THE COMPANY**

1.1.    Name. The Company is organized as a limited liability company pursuant to the Act. The name of the Company is Blue Wolf Capital Management LLC. All business of the Company shall be conducted in such name or under any other name designated from time to time by the Operating Managers.

1.2.    Principal Office of the Company. The principal office of the Company shall be located at One Liberty Plaza, 23rd Floor, New York, NY 10006 or at such other location(s) as the Operating Managers may decide, from time to time.

1.3.    Registered Office and Agent. The Company shall maintain a registered office in the State of Delaware at Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19801 or at such other place within Delaware as the Operating Managers may designate. The name and address of the Company's registered agent for service of process on the Company in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19801 or such other agent as the Operating Managers may from time to time designate.

1.4.    Purpose. The purpose of the Company shall be to engage in any and all lawful activities permitted under the Act. In furtherance of its purpose, the Company shall have and

may exercise all of the powers now or hereafter conferred by the laws of the State of Delaware on limited liability companies formed under the laws of the State, including the power to deal in and with all types of property, both real and personal, tangible and intangible, and to do any and all things related or incidental to this business.

      1.5.   <u>Statutory Compliance</u>.  The Company shall exist under and be governed by, and this Agreement shall be construed in accordance with, the applicable laws of the State of Delaware.  The Operating Managers shall promptly make or cause to be made such filings from time to time as are required by applicable law to give effect to the provisions of this Agreement and to cause the Company to be treated as a limited liability company under the laws of the State of Delaware.

      1.6.   <u>Title to Property</u>.  All property owned by the Company shall be owned by the Company as an entity.  Unless prohibited by applicable law, no Member shall have any ownership interest in Company property in such Member's separate name or right.  Each Member's Interest in the Company shall be personal property for all purposes.

      1.7.   <u>Duration</u>.  The Company shall continue in full force and effect until dissolved and terminated pursuant to Section 9 below.

      1.8.   <u>Qualification in Other Jurisdictions</u>.  The Operating Managers shall cause the Company to be qualified, formed, reformed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business if such qualification, formation, reformation or registration is necessary or desirable in order to protect the limited liability of the Members or to permit the Company lawfully to transact business.

      1.9.   <u>Definitions</u>.  Capitalized words and phrases used in this Agreement have the following meanings:

      "<u>AB</u>" means Adam M. Blumenthal.

      "<u>Act</u>" means the Delaware Limited Liability Company Act, as amended from time to time, and any successor to such Act.

      "<u>Adjusted Capital Account Deficit</u>" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant year, after giving effect to the following adjustments:

          (a)   Credit to such Capital Account any amounts which such Member is obligated to restore or is deemed to be obligated to restore pursuant to this Agreement or the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

          (b)   Debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

      "<u>Affiliate</u>" or "<u>affiliate</u>" means, for any Person, another Person who or which (i) is directly or indirectly (through one or more intermediaries) in control of, under common control with or controlled by such Person or (ii) is directly or indirectly (through one or more

intermediaries) in control of, under common control with or controlled by an Affiliate of such other Person pursuant to clause (i).

"Agreement" means this Amended and Restated Limited Liability Company Agreement, as originally executed and as amended, modified, supplemented or restated from time to time, as the context requires.

"Annual Budget" has the meaning set forth in Section 7.4.

"Board of Managers" has the meaning set forth in Section 7.1(a).

"Capital Account" means, with respect to any Member, the capital account maintained for such Member in accordance with the capital account maintenance rules of Treasury Regulations Section 1.704-1(b)(2)(iv).

"Capital Call Notice" has the meaning set forth in Section 2.2.

"Capital Company" has the meaning set forth in Section 3.9.

"Capital Contribution" means, with respect to any Member as of any time of determination, the sum of (i) the amount of money that such Member has contributed to the Company, (ii) the fair market value, as agreed by the Members, of any property that such Member has contributed to the Company (net of any liabilities that the Company has assumed or taken subject to in connection with acquiring such property) and (iii) the amount of any Company liabilities that such Member has assumed, within the meaning of Section 1.704-1(b)(2)(iv)(c) of the Treasury Regulations, other than in connection with receiving a distribution from the Company.

"Cause" with respect to any Person means (A) a finding by any court or governmental body of competent jurisdiction, or an admission by an Operating Manager in a settlement of any lawsuit or a plea of *nolo contendere* thereto by such Operating Manager, that such person has otherwise committed a material breach of its duties under this Agreement or any fund agreement, as the case may be, or a violation of applicable securities laws, (B) fraud, bad faith or willful misconduct by an Operating Manager in connection with the performance of their respective duties under the terms of this Agreement or any fund agreement, as the case may be, (C) an Operating Manager being convicted of a felony (other than a motor vehicle felony) or fraud, embezzlement or a similar felony involving misappropriation of funds, and (D) an Operating Manager being permanently enjoined by an order, judgment or decree in any state or federal court or regulatory authority that has a material adverse effect on the conduct of the Company's business on a going-forward basis.

"Certificate" means the Company's Certificate of Formation as filed with the Secretary of State of the State of Delaware.

"Chairman" has the meaning set forth in Section 7.1(a).

"Code" means the Internal Revenue Code of 1986, as amended.

"Commitment" means, with respect to JNC, the total Capital Contribution required to be made by JNC in respect of the purchase of its Preferred Interest as set forth in the Schedule of Members.

"Common Interest" means the Interest of a Common Member.

"Common Member" means each Person listed from time to time on the Schedule of Members as a Common Member in their respective capacities as such.

"Common Member Percentage" means, with respect to any Common Member, the percentage set forth opposite such Common Member's name on the Schedule of Members, as adjusted in accordance with this Agreement from time to time.

"Company" means Blue Wolf Capital Management LLC, a Delaware limited liability company.

"Compensation Schedule" means the Compensation Schedule attached hereto which establishes the respective compensation, bonuses and benefits of AB and JWP in the first two years of their providing services to the Company.

"Confidential Information" has the meaning set forth in Section 7.8(c).

"Copelyn" means John Copelyn.

"Covered Person" has the meaning set forth in Section 7.9.

"Departing Member" has the meaning set forth in Section 3.7(a).

"Developments" has the meaning set forth in Section 7.8(e).

"Extra Payment" has the meaning set forth in Section 5.4(c).

"First Close" has the meaning set forth in Section 3.2.

"First Fund" has the meaning set forth in Section 3.2.

"First Fund Establishment Activities" has the meaning set forth in Section 3.2.

"Fund" means any pooled investment vehicle managed by the Company or an Affiliate of the Company and includes the First Fund and any Successor Fund.

"Fund Agreement" means any operating or partnership agreement for any Fund.

"Golding" means Marcel Golding.

"Incapacity" means (i) any condition, continuing for a period of six (6) consecutive months or for a non-consecutive period of eight (8) months within any twelve (12) month period, resulting from any physical or mental injury, illness, infirmity, or lack of capacity (including substance addiction or abuse) which shall render an Operating Manager incapable of performing

-4-

all of the usual duties and functions of his position as an Operating Manager of the Company or (ii) the Company receives written opinions from a physician selected by the Company and a physician selected by the Operating Manager that he will be so disabled with no reasonable expectation that the Operating Manager will be able to resume the performance of such duties and functions; provided, that with respect to both clause (i) and clause (ii), above, such condition can be expected to result in death or can be expected to last for a continuous period of not less than eight (8) months. In computing the period of incapacity for purposes of the preceding sentence, a period in excess of twenty (20) days in any thirty (30) day period shall constitute one (1) month of incapacity.

"Independent Appraiser" has the meaning set forth in Section 3.7(c).

"Interest" means the interest of a Member in the Company, including such Member's economic interest, the right to vote on or participate in the Company's management, such Member's aggregate Capital Account and rights to Profit, Loss and distributions of the Company, together with the associated rights of the Members under this Agreement.

"Investment Company" has the meaning set forth in Section 3.1.

"Investment Company Agreement" means the partnership, operating or other governing agreement of the Investment Company.

"Investment Memorandum" has the meaning set forth in Section 7.5(b).

"JNC" has the meaning as defined in the preamble.

"JNC Managers" means each of Copelyn and Golding, and any successors thereto.

"JNC Option Distribution" has the meaning set forth in Section 5.3(c).

"JNC Option Value" means an amount (in US dollars) equal to the product of one million (1,000,000) and the exercise price per share of JNC stock granted pursuant to the options to purchase such quantity of shares that are issued to AB and JWP, in proportions to be agreed upon by them. In order to convert the value obtained in the preceding sentence into US dollars, the Operating Managers shall use the applicable rate of exchange as of the close of business on the effective date of this Agreement.

"JNC Required Commitment" has the meaning set forth in Section 3.6.

"JWP" means Josh A. Wolf-Powers.

"Legal Representative" has the meaning set forth in Section 8.4.

"Major Decision" has the meaning set forth in Section 7.5.

"Manager" has the meaning set forth in Section 7.1(a). The Managers are hereby designated as "managers" of the Company within the meaning set forth in Section 18-101(10) of the Act.

"Member" means any Person who has an Interest of the Company identified on the signature page of this Agreement and is designated as a Member on the Schedule of Members, or any Member with such an Interest admitted after the date hereof in accordance with the terms of this Agreement.

"Milestones" mean (i) the completion within ninety (90) days of the date of this Agreement of documentation that is appropriate to conduct meaningful pre-marketing activities for the First Fund; (ii) the completion within one hundred eighty (180) days of the date of this Agreement of a private placement memorandum of the First Fund for distribution to investors; (iii) soft-circle indications of interest from third party investors, excluding JNC, to make capital commitments in the aggregate amount of at least Seventy Million Dollars ($70,000,000) in the First Fund before the first anniversary of the date of this Agreement and (iv) the First Close occurring before the second anniversary of the date of this Agreement (provided that such dates shall be tolled to the extent the Suspensive Condition has not been met).

"Offered Common Member" has the meaning set forth in Section 3.7(a).

"Operating Manager" means each of Adam M. Blumenthal and Josh A. Wolf-Powers, and any successors thereto. The Operating Managers are hereby designated as "managers" of the Company within the meaning set forth in Section 18-101(10) of the Act.

"Original Agreement" has the meaning set forth in the recitals.

"Original Members" has the meaning set forth in the recitals.

"Overpayment" shall mean, with respect to any Member, the sum of the following amounts: (i) the amount by which the latest Extra Payment to such Member could have been reduced (but not below zero) such that the value of the Preferred Return Gross Up with respect to such Member would be equal to (or as close as possible to) zero (calculated by disregarding the proviso in the definition thereof which prohibits the Preferred Return Gross Up from being less than zero), plus (ii) if such value is not thereby equal to zero, the additional amount by which the next most recent Extra Payment could have been reduced (but not below zero) such that, when added to the reduction in clause (i), the value of the Preferred Return Gross Up with respect to such Member shall be equal to (or as close as possible to) zero (calculated by disregarding the proviso in the definition thereof which prohibits the Preferred Return Gross Up from being less than zero), with such principles applied to each next most recent Extra Payment, with the sum of such hypothetical reductions constituting the "Overpayment."

"Percentage Interest" has the meaning set forth in Section 3.6.

"Permitted Transferee" means, with respect to any Member who is a natural person, his or her spouse, children, parents, grandchildren and siblings, and charitable organizations and estate planning entities formed for the exclusive benefit of any one or more of the foregoing, and with respect to any Member that is an entity, any Affiliate of such Member.

"Person" means any natural person or individual, firm, company, association, trust, corporation, limited liability company, partnership, governmental body or other entity.

"Preferred Interest" means the Interest of a Preferred Member.

"Preferred Member" means each Person listed from time to time on the Schedule of Members as a Preferred Member in their respective capacities as such.

"Preferred Return" means, as of any calculation date, an eight percent (8%) annual return (or such higher rate that is set forth in any Fund Agreement) on each Member's Unreturned Preferred Capital Contributions Account balance (computed from time to time to reflect additions and reductions to such Unreturned Preferred Capital Contributions Account balance).

"Preferred Return Gross Up" means, as of the termination of the First Fund, a payment equal to (i) the payment that would have been received by a Member as the Final Preferred Return Payment minus (ii) the aggregate amounts received by such Member pursuant to Sections 5.3(a) and (b), 5.4(c) (Extra Payments), 9.2(a)(iii)(A) and (B), and Tax Distributions which are treated as paid under such Sections; provided, that at no time shall the Preferred Return Gross Up be less than zero. The "Final Preferred Return Payment" shall mean the amount of a hypothetical payment which would have to be made by the Company to a Member at the time of the liquidation of the First Fund in order to make the aggregate amounts received by such Member pursuant to Sections 5.3(a) and (b), 9.2(a)(iii)(A) and (B), and Tax Distributions which are treated as paid under such Sections, plus such final hypothetical payment, result in the Member realizing, with respect to the amounts contributed to its Unreturned Preferred Capital Contributions Account, the same gross internal rate of return achieved by a hypothetical limited partner's investment in the First Fund (i.e., calculated without reference to payment of management fees or carried interest on contributed amounts); provided, that at no time shall the Final Preferred Return Payment be less than zero.

"Pre-Fund Investments" has the meaning set forth in Section 3.1.

"Prime Rate" shall mean the interest rate announced from time to time in *The Wall Street Journal, Eastern edition*, as the prime lending rate (regardless of how such rate is specifically described).

"Profit" or "Loss" means, for each fiscal year or other accounting period, an amount equal to the Company's taxable income or loss for such year or period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), including each item thereof, with the adjustments required by Treasury Regulations Section 1.704-1(b)(2)(iv), but excluding amounts allocated under Section 4.2.

"Regulatory Allocations" has the meaning set forth in Section 4.2(g).

"Securities Act" has the meaning set forth in Section 12.1(a).

"Securities" or "Security" means and includes common and preferred stock (including warrants, rights, put and call options and other options relating thereto or any combination thereof), partnership interests, interests in limited liability companies, notes, bonds, debentures, trust receipts and other obligations, instruments or evidences of indebtedness, other property or interests commonly regarded as securities.

-7-

"Sharing Ratio" means eleven-fifteenths to AB and four-fifteenths to JWP (or such other ratio as is agreed to by AB and JWP for any particular context and communicated in writing to the Board of Managers).

"Subsequent Close" has the meaning set forth in Section 3.2.

"Successor Fund" means any pooled investment vehicle with an investment strategy and purpose similar to the First Fund that is formed after the First Fund or a Successor Fund, excluding any parallel fund or alternative investment vehicle established in connection with such First Fund or a Successor Fund.

"Suspensive Condition" means the approval by the South African Exchange Control Authorities of (i) JNC entering into this Agreement and making its initial Capital Contribution to the Company and (ii) JNC making Capital Contributions in response to each Capital Call Notice issued by the Company.

"Tax Distributions" has the meaning set forth in Section 5.1.

"Tax Matters Partner" has the meaning set forth in Section 6.4.

"Tax Payment Loan" has the meaning set forth in Section 5.6.

"Transfer" has the meaning set forth in Section 8.5(a).

"Treasury Regulations" means the Income Tax Regulations promulgated under the Code, as they may be in effect from time to time.

"Unfunded Commitment" means, with respect to JNC, the portion of the total Commitment that has not been paid in as Capital Contributions by JNC.

"Unreturned Preferred Capital Contributions Account" means a memorandum account maintained for each Preferred Member reflecting its Capital Account balance with respect to its Preferred Interest as of the date of this Agreement as set forth on the Schedule of Members, which shall be increased as each portion of JNC's Commitment is contributed to the Company and reduced by each Preferred Member's share of distributions made pursuant to Section 5.3(b) or 9.2(a)(iii)(B).

"Unreturned Common Capital Contributions Account" means a memorandum account maintained for the Common Members reflecting each such Member's Capital Contributions (excluding the contributions of JNC with respect to its Commitment which are included in its Unreturned Preferred Capital Contributions Account and any amounts included in the Unreturned Preferred Capital Contributions Accounts of AB and JWP) contributed to the Company, reduced by such Members' share of distributions made pursuant to Section 5.3(d) or 9.2(a)(iii)(D). The Unreturned Common Capital Contributions Account balances as of the date hereof are (i) JNC: $765, (ii) AB: $539; and (ii) JWP: $196.

"Withholding Tax Act" has the meaning set forth in Section 5.6.

**SECTION 2.  CAPITAL CONTRIBUTIONS AND STATUS OF PARTNERS**

2.1.    <u>Common Member Capital Contributions and Admission</u>.

(a)    Prior to the effective date of this Agreement, each of AB and JWP has made certain Capital Contributions to the Company in respect of their Common Interests.  The Capital Account balances as of the date of this Agreement of AB and JWP with respect to their Common Interests are set forth on the Schedule of Members.

(b)    Immediately upon the satisfaction of the Suspensive Condition, JNC shall make, by wire transfer, a Capital Contribution in respect of its Common Interest in an amount equal to seven hundred sixty-five dollars ($765).  Upon making such Capital Contribution, JNC shall (i) be admitted to the Company as a Common Member and (ii) have a Capital Account balance with respect to its Common Interests as set forth on the Schedule of Members.

(c)    Except as required by law or this Section 2.1, the Common Members shall have no further obligation to make Capital Contributions to the Company.

2.2.    <u>Preferred Member Capital Contributions and Admission</u>.  JNC commits to make an aggregate Capital Contribution to the Company in the amount of its Commitment in respect of its Preferred Interest.  All Capital Contributions by JNC in respect of its Preferred Interest shall be made by wire transfer within ten (10) business days of its receipt of notice from the Operating Managers (the "Capital Call Notice") and as soon as reasonably practicable upon satisfaction of any Suspensive Condition, if applicable.  JNC shall be admitted to the Company as a Preferred Member simultaneously with its admission as a Common Member pursuant to Section 2.1(b). JNC shall contribute to the Company the amount as set forth in the Capital Call Notice until such time as it shall have paid its Commitment in full; <u>provided</u>, <u>however</u>, that:

(a)    JNC shall not be required to make any Capital Contribution in respect of its Commitment with respect to which the Operating Managers have not delivered the Capital Call Notice on or before the date of the second anniversary of this Agreement; and

(b)    JNC shall not be required to make any Capital Contribution for an amount less than One Hundred Thousand Dollars ($100,000).

2.3.    <u>Failure to Make Capital Contributions</u>.

(a)    The Company shall be entitled to enforce the obligations of JNC to make Capital Contributions in respect of its Commitment as specified in Section 2.2.  In the event any such Capital Contribution or other required payment is not made when due (except to the extent such Capital Contribution is not required to be made pursuant to the terms of this Agreement) and if such default has not been cured within thirty (30) days of notice from the Operating Managers, the Operating Managers may, in their reasonable discretion, charge JNC interest at the rate of twelve percent (12%) compounded monthly on the amount due from the date such amount became due until the date on which such payment is received by the Company.  Any distributions to which JNC is entitled shall be reduced by the amount of such interest, and such amount shall be allocated among the Common Members (other than the JNC) in accordance with their respective Common Member Percentages.

(b)     Without limiting the foregoing, and in addition to the above, no part of any distribution shall be paid to JNC from which there is then due and owing to the Company, at the time of such distribution, any amount required to be paid to the Company.  At the election of the Operating Managers, the Company may either (i) apply all or part of any such withheld distribution in satisfaction of the amount then due to the Company from JNC or (ii) withhold such distribution until all amounts then due are paid to the Company by JNC.  Upon payment of all amounts due to the Company (by application of withheld distributions or otherwise), the Operating Managers shall distribute any unapplied balance of any such withheld distribution to JNC.

(c)     The defaulting Preferred Member is obligated to pay the Company and the other Members for all damages that may result to such parties from a failure to make a Capital Contribution by it, including, without limitation, reasonable attorney's fees and court costs, but excluding any consequential damages (including, without limitation, lost profits).  In addition, the operating Managers may enforce all rights and remedies against such defaulting Preferred Member which are available at law or equity to enforce this Section 2.3.

Notwithstanding the foregoing, the Original Members agree and acknowledge that JNC shall not be deemed to have violated an obligation to make a Capital Contribution if its failure to make such payment is due to the South African Reserve Bank not having approved such payment.

2.4.     <u>No Rights To Demand Return of Capital Contribution</u>.  Except as otherwise provided in this Agreement, no Member shall be entitled to withdraw any part of such Member's Capital Account or Capital Contributions or to receive any distribution.  No Member shall have the right to partition the assets of the Company or to cause the sale of any Company asset except as otherwise expressly set forth herein.  No Member shall receive any interest, salary or draw with respect to its Capital Contributions or its Capital Account or for services rendered on behalf of the Company or otherwise in its capacity as a Member, except as otherwise provided in this Agreement.

2.5.     <u>Liabilities of Members</u>.  Except as otherwise expressly set forth herein or in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or Manager of the Company shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or acting as a Manager of the Company.

2.6.     <u>Additional Obligations</u>.  To the extent that the assets of JNC are insufficient to satisfy its obligations to the Company hereunder, Johnnic Holdings Limited, a corporation organized under the laws of the Republic of South Africa, guarantees the obligation of JNC, as a Preferred Member, to make Capital Contributions to the Company.

## SECTION 3.  COMPANY INVESTMENT ACTIVITIES

3.1.     <u>Pre-Fund Investment Activities</u>. Subject to the Section 3.1(b), the Company is authorized to make investments in Securities prior to the First Close (the "<u>Pre-Fund Investments</u>").  Such investments shall be made through a subsidiary limited partnership, limited

-10-

liability company or such other entity (the "<u>Investment Company</u>") determined and structured by the Managers; <u>provided</u>, that, unless otherwise agreed by the Managers, the Investment Company Agreement shall incorporate the distribution provisions set forth in <u>Schedule 3.1</u>. The Members intend that the Pre-Fund Investments shall be sold or otherwise transferred to the First Fund, if established, in accordance with Section 3.2.

      3.2.   <u>First Close</u>. In order to establish a pooled investment vehicle as soon as reasonably possible following the effective date of this Agreement, each of AB, JWP, Copelyn, Golding and the Company shall use their best efforts to obtain capital commitments from third-party investors in the aggregate amount of at least Seventy Million Dollars ($70,000,000) (the "<u>First Fund Establishment Activities</u>"). Upon obtaining such capital commitments from third-party investors or at such other time as the Managers may determine in their discretion, the Company shall form a pooled investment vehicle (the "<u>First Fund</u>") and admit such third-party investors, along with JNC, as limited partners in the First Fund (the "<u>First Close</u>"). Following the First Close, additional limited partners may be admitted to the First Fund and existing limited partners may increase their capital commitments to the First Fund in accordance with the governing documents of the First Fund (each such close, a "<u>Subsequent Close</u>"). Unless otherwise agreed to by the Managers, the Investment Company shall sell or otherwise transfer each Pre-Fund Investment to the First Fund for a purchase price equal to its then-current fair market value (which value the Members intend to be no lower than the purchase price of such Pre-Fund Investment plus the carrying costs and expenses associated with such Pre-Fund Investment, if possible). Any such transfers shall occur within ninety (90) days of the First Close. In the event any Pre-Fund Investment is not transferred to the First Fund pursuant to this Section 3.2, such investment shall remain in the Investment Company. In lieu of receiving a distribution of proceeds from a capital transaction in respect of such sale of Pre-Fund Investments to the First Fund, JNC may elect to have the transfer of Pre-Fund Investments to the First Fund treated as an in-kind capital contribution by JNC to the First Fund which is credited against JNC's capital commitment to the First Fund. The parties hereto anticipate that any distributions by the First Fund and any Successor Fund shall be made in accordance with <u>Schedule 3.2</u>. For the purposes of this Section 3, JNC may designate an Affiliate to fulfill its capital commitment obligations to the Investment Company and the First Fund.

      3.3.   <u>Cessation of First Fund Establishment Activities</u>. In the event the Company ceases to pursue or continue the First Fund Establishment Activities, in the discretion of the Managers, but continues to manage Pre-Fund Investments, the Members and Managers shall negotiate in good faith to reallocate "carried interest" distributions to AB and JWP (as set forth in <u>Schedule 3.1</u>) after such determination such that AB's and JWP's carried interest distributions are made on an investment-by-investment basis rather than on an aggregate basis.

      3.4.   <u>JNC Capital Commitments to First Fund</u>. (a) If AB, JWP, Copelyn, Golding and the Company have obtained capital commitments from third-party investors (other than JNC) in the aggregate amount of at least Seventy Million Dollars ($70,000,000), JNC shall commit at least Thirty Million Dollars ($30,000,000) of capital to the First Fund. In the event that commitments from limited partners to the First Fund on the First Close or at any Subsequent Close total One Hundred Twenty Million ($120,000,000) or greater, JNC shall increase its capital commitment to the First Fund to an aggregate amount equal to twenty five percent (25%) of the total capital commitments to the First Fund; <u>provided</u>, <u>however</u>, that JNC's capital

-11-

commitment to the First Fund shall not exceed Forty Million Dollars ($40,000,000); provided, further, that while all commitments to the First Fund (including JNC's commitment) shall be denominated in United States dollars, JNC shall not be required to make any commitment to the First Fund which would be in excess of the sum of the United States dollar equivalent of Two Hundred Forty Million (240,000,000) Rand (calculated using the rand-dollar exchange rate as of the date of such commitment) plus JNC's *pro rata* share of the value of any Pre-Fund Investments transferred to the First Fund at the time of its initial commitment to the First Fund.

3.5.     <u>Co-Investment Rights</u>. AB and JWP may co-invest, pro rata based on the Sharing Ratio, in any Security in which the Investment Company (pre-Fund) invests up to an aggregate amount of two percent (2%) of such investment. Any such co-investment by AB and JWP shall be on the same terms as the Investment Company's investment in such Security.

3.6.     <u>Successor Fund</u>. For each Successor Fund sponsored by the Company, AB and JWP and their affiliates, JNC shall have the right to retain 51% of the carried interest in exchange for making a capital commitment to such fund equal to the "<u>JNC Required Commitment</u>," which shall be the lesser of: (i) 25% of the aggregate capital commitments to such Successor Fund inclusive of JNC's commitment to such Fund; or (ii) a capital commitment to such Successor Fund equal to the sum of: (w) Sixty Million (60,000,000) Rand, plus (x) the aggregate US dollar amount of distributions received by JNC in respect of all prior Funds, plus (y) the aggregate US dollar amount of JNC's unfunded capital commitment to all prior Funds, plus (z) the fair market value of JNC's interest in all prior Funds, in each case as of each closing of commitments to such Successor Fund; and (iii) the greatest amount that the Managers reasonably determine is not likely to cause JNC's aggregate funding requirement for capital commitments to all Funds at any given time, net of all distributions received at such time from all previous Funds, to exceed its commitment to the First Fund by Sixty Million Rand. In the event that JNC commits an amount less than the JNC Required Commitment to any Successor Fund, the carried interest to which it would otherwise be entitled shall be reduced by the ratio such actual commitment bears to the JNC Required Commitment to such Successor Fund.

3.7.     <u>AB/JWP Departure.</u>

(a)     In the event that either AB or JWP (the "<u>Departing Member</u>") is removed from the Company as an Operating Manager for Cause, dies, becomes Incapacitated or leaves the Company voluntarily, each Common Member (other than the Departing Member) or its designee, to whom a transfer will not violate Section 8.5(a) (it being understood that the consent of the Board of Managers under Section 8.5(a) shall not be required with respect to a transfer pursuant to this Section 3.7) ("<u>Offered Common Member</u>") may purchase, by notice within 30 days of such removal, in such Offered Common Member's sole discretion, in proportion to such Offered Common Member's Common Member Percentage (calculated by excluding the percentage of the Departing Member), one hundred percent (100%) of the Departing Member's Common Interest and Preferred Interest, in accordance with this Section 3.7.

(b)     If any Offered Common Member does not elect to purchase the entire interest offered to it, such unpurchased interest shall be reoffered to the other Offered Common Members (in proportion to their Common Member Percentages) who have purchased the entire interest offered to them until either all of such interest is acquired or no Offered Common

-12-

Member wishes to make a further investment. The Offered Common Members shall notify the Departing Member (or his estate or representative, if applicable) in writing, of their intention to exercise their purchase right under Section 3.7(a) within thirty (30) days of the events giving rise to rights under Section 3.7(a). At the closing of such purchase, each purchaser shall, as payment in full for the amount of the Departing Member's interest being purchased by such purchaser, (i) deliver cash or other immediately available funds for no less than twenty percent (20%) of the value of Common Interest and Preferred Interest being purchased, the value of which shall be determined in accordance with Section 3.7(c), and (ii) deliver a five-year promissory note, bearing interest at the Prime Rate, payable quarterly, with payments of principal on such dates as the Company makes distributions and amounts proportionate to the amount such Departing Member would have received if he still was a Member), and in a form approved by the Board of Managers, for the remaining value of the Common Interest and Preferred Interest being purchased. The date and place for closing, and all time limits for acceptances of the offers set forth in this Section 3.7(b), shall be determined by the mutual agreement of the purchaser(s) and the Departing Member, but in no event shall such closing take place later than ninety (90) days after the purchaser's notification to the Departing Member pursuant to this Section 3.7(b).

(c)     Determination of Value of an Interest. The value of a Departing Member's Common Interest and/or Preferred Interest shall be determined as follows: The fair market value of the Company, determined based on a hypothetical sale of the company to an unrelated third party on an arms-length basis, shall be determined by a nationally-prominent appraisal firm or investment bank (an "Independent Appraiser"), which is not an Affiliate of any Member, and which is experienced in the valuation of businesses similar to the Company. The value of the interests being purchased shall be determined based on the amount the Departing Member would receive in respect of the interests being sold pursuant to the distribution priorities set forth in Section 9.2(a) upon the hypothetical liquidation of the Company on the assumption that the amount available to be distributed in such hypothetical liquidation equals the fair market value of the Company as determined by the Independent Appraiser. The Independent Appraiser shall be selected by the Managers and the Departing Member; provided, however, that if the Managers and Departing Member cannot agree on an Independent Appraiser, each side shall select an Independent Appraiser and the two Independent Appraisers shall select a third Independent Appraiser to serve as the Independent Appraiser for purposes set forth under this Agreement. The Members acknowledge that Houlihan Lokey Howard & Zukin and Duff & Phelps are nationally-prominent appraisal firms, experienced in the valuation of businesses similar to the Company.

3.8.    Reviews. On the ninety day, twelve month and twenty-four month anniversaries of the date of this Agreement, the Board of Managers shall review the Company's progress toward meeting the Milestones. If the JNC Managers determine, in their sole discretion, that the Milestones have not been achieved or that the occurrence of the First Close is not reasonably likely, then the JNC Managers may cause the Company to terminate all First Fund Establishment Activities and reduce JNC's Commitment to a level consistent with the reduced scope of the Company's activities. In the event the JNC Managers terminate all First Fund Establishment Activities pursuant to this Section 3.8, the Operating Managers shall prepare a revised Annual Budget consistent with operating the Company to manage any existing Pre-Fund Investments and, at JNC's option, develop new investment opportunities for the benefit of JNC. In the event the JNC Managers terminate all Fund Establishment Activities pursuant to this Section 3.8, such

-13-

activities shall not be resumed without the prior unanimous consent of the Board of Managers, which consent may be withheld in each Manager's sole discretion.

      3.9.    Capital Company. The Managers may establish one or more limited partnerships, limited liability companies or other forms of entity (each such entity, a "Capital Company") to serve, either directly or through subsidiaries, as the manager or general partner of each Investment Company or Fund. Each Capital Company may be capitalized by debt, equity, or a combination thereof, in the discretion of the Board of Managers, with such capital being used to fund the general partner's or managing member's capital commitment to each Investment Company and/or Fund, as applicable. Unless otherwise agreed by the Managers:

           (a)    The members, partners or other equity holders of a Capital Company shall include the Company, JNC, AB and JWP.

           (b)    The partnership, operating or other governing agreement of a Capital Company shall provide that, prior to making distributions to any other partner, member or equity holder (except as a return of capital invested in the Capital Company), such Capital Company shall make distributions to the Company, in the aggregate amounts then owing to the Preferred Members and/or AB and JWP under Sections 5.3(a)-(d), from the distributions such Capital Company receives from Investment Companies and Funds of which it is manager or general partner (as reflected in Schedules 3.1 and 3.2). Any such amounts distributed by a Capital Company to the Company shall be distributed to the Members in accordance with Sections 5.3 and 5.4.

           (c)    Nothing in this Section shall prohibit the Board of Managers from authorizing the Company, JNC, AB and JWP from holding direct membership, limited partnership or other equity interests in an Investment Company or Fund. Notwithstanding anything else contained herein to the contrary (but subject to the proviso below in this sentence), JNC shall make reasonable commercial efforts to structure the Capital Company and Investment Company in a manner which will accommodate the tax considerations of AB and JWP, including in light of forthcoming guidance expected from the Internal Revenue Service with respect to profits interests in partnership entities, provided, that such structuring shall not have an adverse effect on the economic and management rights of JNC as otherwise provided for in this Agreement.

## SECTION 4. CAPITAL ACCOUNTS, ALLOCATION OF INCOME AND LOSS

      4.1.    Allocation of Net Income or Net Loss Generally.

           (a)    Subject to Section 4.2, for purposes of maintaining Capital Accounts and in determining the rights of the Members among themselves, the Company's Profit and Loss shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after giving effect to such allocation is, as nearly as possible, equal (proportionately) to the amount of the distributions which would be made to such Member during such taxable year pursuant to Section 5.3, based on the assumptions that (i) the Company is dissolved and terminated; (ii) its affairs are wound up and each Company asset is sold for cash equal to its book value; (iii) all Company liabilities are satisfied (limited with respect to each

-14-

nonrecourse liability to the book value(s) of the asset(s) securing such liability); and (iv) the net assets of the Company are distributed in accordance with Section 5.3 to the Members immediately after giving effect to such allocation.

    4.2.    <u>Regulatory Allocations</u>.

        (a)    <u>Qualified Income Offset</u>. Notwithstanding anything to the contrary in this Section, if during any taxable year of the Company any Member unexpectedly receives an adjustment, allocation or distribution as described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), there shall be allocated to that Member items of income and gain in an amount sufficient to eliminate that Member's Adjusted Capital Account Deficit as quickly as possible. The foregoing sentence is intended to be a "qualified income offset" provision as described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d), and shall be interpreted and applied in all respects in accordance with that Section. This Section 4.2(a) shall be applied only after all other allocations provided for in this Section 4 have been tentatively made as if this Section 4.2(a) were not in this Agreement.

        (b)    <u>Gross Income Allocation</u>. Notwithstanding the allocations provided in Section 4.1, in the event any Member has a Capital Account deficit at the close of any fiscal year that is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), such Member shall be specially allocated items of gross income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.2(b) shall be made only if and to the extent that such Member would have a Capital Account deficit in excess of such sum after all other allocations provided for in this Section 4 have been tentatively made as if Section 4.2(a) and this Section 4.2(b) were not in the Agreement.

        (c)    <u>Loss Limitation</u>. The Losses allocated pursuant to Section 4.1 shall not exceed the maximum amount of Losses which can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any taxable year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 4.1, the limitation set forth in this Section 4.2(c) shall be applied on a Member by Member basis so as to allocate the maximum permissible Loss to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

        (d)    <u>Minimum Gain Chargeback</u>. This Agreement shall be deemed to contain a "minimum gain chargeback" within the meaning of Treasury Regulations Section 1.704-2, and allocations shall be made accordingly.

        (e)    <u>Partner Nonrecourse Deductions</u>. In accordance with Treasury Regulations Section 1.704-2(i)(1), any item of Company loss or deduction which is attributable to debt for which a Member bears the economic risk of loss shall be allocated to that Member to the extent of its economic risk of loss.

(f)    Nonrecourse Deductions. Nonrecourse deductions, as defined in Treasury Regulations Section 1.704-2(b)(1), shall be allocated in proportion to Common Member Percentages.

(g)    Curative Allocations. The allocations set forth in Sections 4.2(a)-(f) (the "Regulatory Allocations") are intended to comply with certain requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2. Notwithstanding any other provisions of this Section 4.2 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other profits, losses, and items of income, gain, loss and deduction among the Members so that to the extent possible, the net amount of such allocations of other profits, losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred. However, allocations under this Section 4.2(g) shall be made (i) by taking into account future Regulatory Allocations under this Section 4.2 that, although not yet made, are likely to offset other Regulatory Allocations previously made under this Section 4.2, and (ii) only to the extent that they are reasonably necessary or appropriate in order to realize the intended economic arrangement among the Members.

(h)    Section 754 Election. In the event of the transfer of a Member's interest or upon the death of an individual Member, or in the event of the distribution of Company assets to any Member, the Company may file an election, in accordance with applicable Treasury Regulations, to cause the basis of the Company's assets to be adjusted for federal income tax purposes as provided by Sections 734 and 743 of the Code. Adjustments to the basis of the Company property resulting from such elections shall be entered in the books of the Company and shall be credited to or charged against the Capital Accounts of the Member or Members whose transactions gave rise to such adjustment or otherwise in the manner provided in Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

4.3.    Tax Allocations. Allocations for tax purposes shall be made on the same basis as allocations to Capital Accounts, except that adjustments shall be made as required in order to comply with Section 704(c) of the Code and the Treasury Regulations thereunder and Treasury Regulation Section 1.704-1(b)(2)(iv)(g).

4.4.    Transfer of Interest. Unless the Operating Managers determine otherwise, in the event of a transfer of an Interest or of the death or retirement of a Member, such allocations shall be based on the number of days in the particular year during which each owned such Interest; provided, that with respect to the sale or other disposition of Company assets, allocations shall be made by a closing of the books. Allocations pursuant to this Section 4.4 shall be done on a reasonable basis consistent with the Code and Treasury Regulations thereunder.

4.5.    Capital Account Maintenance. Capital Accounts shall be maintained in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv). The Members agree that the Capital Accounts of the Members have been booked to the amounts set forth herein as of April 1, 2006, in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(f).

4.6.    Safe Harbor Election. The Members acknowledge that IRS Notice 2005-43 announces a future Safe Harbor Election, to become operative when certain future guidance is

-16-

issued by the IRS, which will consist of the filing of an election that the Company intends to treat the issuance of a profits interest in exchange for services as the issuance of an interest which has no capital account or current liquidation value and thus to take no deduction for it, and agree that the Operating Managers shall be authorized to make such Safe Harbor Election as set forth in Notice 2005-43 in accordance with such future guidance, if any, as may be applicable at the time of an issuance of a profits interest by the Company. Each Member agrees to comply with all requirements of the Safe Harbor, including, without limitation, filing its income tax returns consistently with the intended treatment under such Safe Harbor. A Member's obligations to comply with the requirements of this Section 4.6 shall survive such Member's ceasing to be a Member of the Company and/or termination, dissolution, liquidation and winding up of the Company, and, for purposes of this Section 4.6, the Company shall be treated as continuing in existence.

## SECTION 5.  DISTRIBUTIONS

5.1.    <u>Tax Distributions</u>.  Subject to this Section 5.1, but prior to the application of Section 5.3, the Company shall distribute (to the extent of cash available as determined by the Managers in their reasonable discretion) to each of AB, JWP and JNC in cash, with respect to each fiscal year, either during such year or within ninety (90) days thereafter, an amount designed to assist Members in satisfying their tax liability, including estimated tax payments, arising from holding an interest in the Company (such distributions under this Section 5.1 being referred to herein as "<u>Tax Distributions</u>").  In determining the amount of any Tax Distribution, it shall be assumed that (i) each Member (including JNC) is taxable at the maximum marginal effective rate of federal, state and local income tax applicable to a natural person residing in New York, New York, taking account of any difference in rates applicable to ordinary income and capital gains and any allowable deductions in respect of such state and local taxes in computing such Members' liability for federal income taxes, as determined by the Operating Managers after consulting with accountants to the Company, and (ii) all allocations of income, gain, deduction, loss and credit from the Company were, for such year, the sole source of income and loss for such Members.  Notwithstanding any provision of this Section 5.1, any Tax Distribution shall be made to all the Members in proportion to their respective assumed tax liabilities, calculated as set forth above, regardless of each Member's actually anticipated income tax liability.  Any Tax Distribution shall be applied against and reduce the amount a Member otherwise would be entitled to receive pursuant to Section 5.3 in accordance with the subsection(s) thereof under which such Tax Distributions would otherwise have been distributed.

5.2.    <u>Timing of Distributions</u>.  The Company shall distribute the cash proceeds (a) of all dispositions of Securities and (b) all other current income, in each case net of unpaid or accrued Company expenses and reserves for reasonably estimated expenses and follow-on investments in existing Securities reasonably expected to be made within sixty (60) days following the receipt of such cash, as determined by the Operating Managers in their reasonable discretion, as soon as practicable but in no event later than (1) sixty (60) days after the Company receives such proceeds or income in the case of Securities and (2) annually in the case of other current income.  The Operating Managers may cause the Company to make other distributions, in cash or in kind, in their sole discretion, subject to the other provisions of this Section 5.

5.3.    Priority of Distributions.  Except as otherwise provided in Section 5.1 with respect to Tax Distributions, and Sections 5.4 and 5.5, and subject to Section 9.2, all distributions shall be made as follows:

(a)    First, to the Preferred Members, in an amount equal, on a cumulative basis, to the unpaid Preferred Return owed to each of them, in proportion to the amounts thus distributable to each;

(b)    Second, to the Preferred Members, until their Unreturned Preferred Capital Contributions Account balances have been reduced to zero, in proportion to the amounts thus distributable to each;

(c)    Third, if the First Close has occurred, to AB and JWP, in accordance with the Sharing Ratio, until AB and JWP have received, on a cumulative basis, an amount which in the aggregate is equal to twenty percent (20%) of the JNC Option Value (the "JNC Option Distribution");

(d)    Fourth, to the Common Members, until their Unreturned Common Capital Contributions Account balances have been reduced to zero, in proportion to the amounts thus distributable to each; and

(e)    Thereafter, to the Common Members in accordance with their Common Member Percentages.

5.4.    Special JNC Distributions.

(a)    Notwithstanding Section 5.3 of this Agreement, to the extent any distribution is made by the Investment Company to the Company or Capital Company pursuant to paragraph (h) on Schedule 3.1, the amount so distributed to the Company or Capital Company shall be distributed directly to JNC.

(b)    Upon the termination of the First Fund, the Company shall distribute to JNC, AB and JWP an amount equal to the Preferred Return Gross Up owed to each, in proportion to the amounts thus owed to each.

(c)    AB and JWP, acting jointly, shall have the right to cause the Company at any time to distribute to the Preferred Members cash (an "Extra Payment") which AB and/or JWP would have been otherwise entitled to receive as a distribution other than pursuant to Section 5.3(a), 5.3(b), 9.2(a)(iii)(A), or 9.2(iii)(B).  Any such Extra Payment shall be distributed in proportion to the amounts distributed or distributable as the Preferred Return, and shall be included in calculating the Preferred Return Gross Up in the manner provided for in the definition thereof in Section 1.9 of this Agreement.  Adjustments shall be made to the allocations of Profit and Loss, and items thereof, hereunder as reasonably necessary in order to take into account an Extra Payment.  AB and JWP shall have the right to contribute capital or loan the Company money in order to fund an Extra Payment (interest on such a loan shall be charged at the applicable federal rate under Section 1274 of the Code; and the cost of such interest shall be borne by AB and JWP, by an offset to their distributions if not otherwise funded by them).

-18-

(d)     Overpayments.  If upon termination of the First Fund, any Extra Payment has been made, then such Member shall contribute to the Company the Overpayment, if any, to itself, and such amount shall be distributed to AB and JWP in proportion to their economic sharing of the Extra Payment being refunded.

(e)     Guaranty of the Preferred Return Gross Up.  The parties hereto covenant and agree that the governing documents of the First Fund's general partner shall provide for a joint and several guaranty, as between the Company and the general partner, of payment of the Preferred Return Gross Up to the Preferred Members in the event that the Company fails to meet such obligation upon the termination of the First Fund.  Such amounts shall be paid to the Preferred Members as if they were paid as a first priority out of distributions prior to the distribution of carried interest to the members of the general partner of the First Fund.

5.5.    Distributions on Dissolution.  In the event of the dissolution and liquidation of the Partnership pursuant to Section 9, the net cash proceeds and/or other assets of the Company available for distribution after the payment of all expenses and previously outstanding indebtedness (or set aside for the establishment by the Managers of reserves) shall be distributed among the Members in the amounts and with the priorities set forth in Section 9.2 of this Agreement.  If any of the assets, including, without limitation, Securities of the Company are to be distributed in kind, the fair market value of such assets shall be determined as of the time of such distribution (or at such other day reasonably close to the day of such distribution as the Operating Managers shall determine).  There shall be allocated among the Members, in accordance with Section 4 of this Agreement, the amount of Profits or Losses, if any, that would have been realized by the Company if such assets had been sold by the Company for prices equal to their respective fair market values as so determined.

5.6.    Taxes Withheld.  Unless treated as a Tax Payment Loan (as hereinafter defined), any amount paid by the Company for or with respect to any Member on account of any withholding tax or other tax payable with respect to the income, profits or distributions of the Company pursuant to the Code, the Treasury Regulations, or any state or local or foreign statute, regulation or ordinance requiring such payment (a "Withholding Tax Act") shall be treated as a distribution to such Member for all purposes of this Agreement, consistent with the character and source of the income, profits or cash which gave rise to the payment or withholding obligation. To the extent that the amount required to be remitted by the Company under the Withholding Tax Act exceeds the amount of available cash otherwise then distributable to such Member, the excess shall constitute a loan from the Company to such Member (a "Tax Payment Loan") which shall be payable upon demand and shall bear interest, from the date that the Company makes the payment to the relevant taxing authority, at the Prime Rate, plus two (2) percentage points, compounded monthly.  So long as any Tax Payment Loan or the interest thereon remains unpaid, the Company shall make future distributions due to such Member under this Agreement by applying the amount of any such distribution first to the payment of any unpaid interest on all Tax Payment Loans of such Members and then to the repayment of the principal of all Tax Payment Loans of such Member.  The Operating Managers shall use their reasonable efforts to give any affected Member at least twenty (20) days' prior notice of any required withholding or tax payment.

-19-

To the extent that a non-U.S. Member claims to be entitled to a reduced rate of, or exemption from, U.S, or other withholding tax pursuant to an applicable income tax treaty, or otherwise, the non-U.S. Member shall furnish the Operating Managers with such information and forms as it may require and are necessary to comply with the Withholding Tax Act governing the obligations of withholding tax agents. Each non-U.S. Member represents and warrants that any such information and forms furnished by it shall be true and accurate and agrees to indemnify the Company and each of the Members from any and all damages, costs and expenses resulting from the filing of inaccurate or incomplete information or forms relating to such withholding taxes, or for the failure to fulfill any of its obligations under this Section 5.6.

The Operating Managers shall have the authority to take all actions which they reasonably believe to be necessary to enable the Company to comply with the provisions of any Withholding Tax Act applicable to the Company and to carry out the provisions of this Section. Nothing in this Section shall create any obligation on the Operating Managers to advance funds to the Company or to borrow funds from third parties in order to make any payments on account of any liability of the Company under the Withholding Tax Act. Each Member agrees to indemnify the Company and the other Members for all damages that may result to such parties from a failure to meet its obligations pursuant to this Section 5.6, including, without limitation, reasonable attorneys' fees and court costs.

## SECTION 6. ACCOUNTING AND RECORDS

6.1.    Books and Records. The Operating Managers shall keep or cause to be maintained at the Company's principal office separate books of account for the Company which shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Company business in accordance with generally accepted accounting principles consistently applied. Each Member shall, at such Member's sole expense, have the right, at any time without notice to the other, to examine, copy and audit the Company's books and records during normal business hours.

6.2.    Reports. The Operating Managers shall prepare or cause to be prepared the financial reports of the Company and shall coordinate financial matters of the Company with the Company's accountants. The Operating Managers shall cause each Member to be furnished with audited financial statements of the Company prepared in accordance with generally accepted accounting principles, including a copy of the balance sheet of the Company as of the last day of each fiscal year, and a statement of income or loss for the Company for such fiscal year. Annual statements shall also include a statement showing any item of income, deduction, credit or loss allocable for federal income tax purposes pursuant to the terms of this Agreement. The Operating Managers will cause the Company to deliver annual statements to the Members within 90 days after the close of each fiscal year of the Company. The Operating Managers shall furnish to each Member, within forty five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Company, unaudited quarterly financial statements of the Company for the quarter then ended, and a brief narrative report as to the status and operations of the Company, each Investment Company and Fund, if any, and each Investment Company or Fund investment.

-20-

6.3.    Tax Returns. The Operating Managers shall prepare or cause the Company's accountants to prepare all income and other tax returns of the Company and shall cause the same to be filed in a timely manner. The Operating Managers shall furnish to each Member a copy of each such return, together with any schedules or other information which each Member may require in connection with such Member's own tax affairs, within 75 days after the close of each fiscal year of the Company. The expenses of preparing the Company's tax returns shall be expenses of the Company and not of any Member.

6.4.    Tax Matters Partner. The Board of Managers shall designate an Operating Manager to receive all notices from the Internal Revenue Service which pertain to the tax affairs of the Company. Such Manager shall be the Company's "Tax Matters Partner" pursuant to Code Section 6231(a)(7), with all powers and duties commensurate with such designation. Initially, JWP shall be the Company's Tax Matters Partner.

6.5.    Fiscal Year; Accounting Method. The fiscal year of the Company shall end on March 31, unless otherwise approved by the Board of Managers taking into account applicable federal income tax laws. As used in this Agreement, a fiscal year shall include any partial fiscal year at the beginning and end of the Company term. The Company shall utilize such method or methods of accounting, for financial reporting and tax purposes, as the Operating Managers shall determine consistent with applicable laws and principles.

6.6.    Bank Accounts. The Operating Managers shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Company, whether or not in its immediate possession or control. The funds of the Company shall be kept in one or more accounts in the name of the Company and shall not be commingled with the funds of any other Person, and the Operating Managers shall not employ, or permit any other Person to employ, such funds in any manner except for the benefit of the Company. The bank accounts of the Company shall be maintained in such banking institutions as are approved by the Operating Managers. Withdrawals from such accounts, and checks, drafts and other drawings on such accounts, shall be made only in the regular course of Company business and as otherwise authorized in this Agreement on such signature or signatures as the Operating Managers may determine.

## SECTION 7.  MANAGEMENT AND OPERATIONS; COMPENSATION

7.1.    Board of Managers.

(a)    Management of the business and affairs of the Company shall be vested in a board of managers (the "Board of Managers"). Any action required or permitted to be taken by the Company shall be made by the Board of Managers as set forth in this Section 7. The Board of Managers shall consist of four Persons (the "Managers"). The initial Managers shall be AB, JWP, Copelyn and Golding. AB shall be the Chairman of the Board of Managers (the "Chairman").

(b)    All actions of the Board of Managers shall be taken either (i) at a meeting duly called by the Chairman or any other Manager, which meeting may be held in person or by telephone conference or, (ii) in lieu of a meeting, by means of the written consent of Managers

having not less than the minimum number of votes that would be necessary to authorize or take such action if a meeting of the Board of Managers were held.

(c)    Managers shall be reimbursed from the Company for reasonable expenses incurred in connection with performing their duties hereunder.

(d)    Unless otherwise provided herein, all decisions or actions required or permitted to be taken under this Agreement by the Managers, Operating Managers or JNC Managers, as applicable, shall require the unanimous consent of such Managers, Operating Managers or JNC Managers, as applicable.

7.2.    Day-to-Day Operations.  The Board of Managers hereby appoints the Operating Managers to conduct the day-to-day operations of the Company.  All decisions regarding the activities and operations of the Company shall be considered related to the day-to-day operations of the Company except to the extent such decision is a Major Decision set forth in Section 7.5. Subject to Section 7.5 and except as provided in this Section 7.2, the Operating Managers shall have the power on behalf and in the name of the Company to carry out and implement the purposes of the Company set forth in Section 1.4, including without limitation the power to:

(a)    provide services necessary to manage the Funds;

(b)    to make all expenditures permitted by this Agreement and pursuant to the Annual Budget;

(c)    to appoint officers of the Company;

(d)    to enter into, execute, amend, supplement, acknowledge and deliver any and all agreements, contracts, documents, certificates and instruments with (but not limited to) banks, trust companies or other investment advisers or fund administrators, including any Affiliates of the Managers for the performance of such functions; provided, that the Managers may designate additional persons to be authorized signatories with respect to the obligations set forth in this Section 7.2;

(e)    to protect and preserve the title and interest of the Company with respect to the assets at any time owned or acquired by the Company;

(f)    to collect all amounts due to the Company, and otherwise to enforce all rights of the Company;

(g)    to designate and appoint one or more agents for the Company who shall have such authority as may be conferred upon them by the Operating Managers, and who may perform any of the duties, and exercise any of the powers and authority, conferred upon the Operating Managers hereunder, including, but not limited to, designation of one or more agents as authorized signatories on any bank accounts maintained by the Company;

(h)    to establish and maintain one or more bank accounts for the Company in such bank or banks having assets of at least $250,000,000 as the Operating Managers may designate, from time to time, as depositories of the funds of the Company;

-22-

(i)     to pay all debts, expenses and obligations the Company must pay pursuant to this Agreement;

(j)     to the extent that funds of the Company are available, to make all distributions periodically to the Members in accordance with the provisions of this Agreement;

(k)     to establish and maintain the books and records of the Company in accordance with this Agreement;

(l)     to perform all normal business functions, and otherwise operate and manage the business and affairs of the Company in accordance with and as limited by this Agreement;

(m)     to establish and maintain a Capital Account for each Member in accordance with this Agreement;

(n)     to deal with, or otherwise engage in business with, or provide services to, and receive compensation therefor from, any Person who has in the past dealt or engaged in business with the Operating Managers or any of their Affiliates or may in the future have such dealings or do such business with the Operating Managers or any of their Affiliates;

(o)     to engage in any kind of activity and to perform and carry out contracts of any kind necessary to, or in connection with or convenient or incidental to, the accomplishment of the purposes of the Company, so long as said activities and contracts may be lawfully carried on or performed by a Company under the laws of the State of Delaware, in accordance with and as limited by this Agreement;

(p)     to provide such management, administrative, operational and other services with respect to any Fund which are delegated to it by the general partner of such Fund; provided, that the general partner of such Fund shall remain ultimately responsible for the overall management of such Fund and for its duties and responsibilities thereunder; and

(q)     to provide such administrative and managerial services to the Company as shall be necessary for the Company's operations, except that decisions to make an investment or in connection with activities enumerated in Section 7.5 shall be made solely by unanimous consent of the Board of Managers.

All decisions that are to be made by the Operating Managers shall be made by the mutual agreement of the Operating Managers; provided, that, to the extent the Operating Managers are unable to reach an agreement on a particular matter following a good faith attempt to reach consensus, the final decision with respect to such matter shall be made by the JNC Managers; provided, however, JNC reserves the right to mandate that any or all of the decision-making authority of the Operating Managers as specified in this Section 7.2 must require the prior approval of JNC upon notice by JNC to the Operating Managers (provided that such mandate must be in writing and shall apply prospectively only).

7.3.    <u>Removal and Resignation of the Managers</u>.

(a)    Each of AB and JWP may be removed as an Operating Manager of the Company for Cause. Prior to the First Close, the decision to remove either AB or JWP as an Operating Manager shall be made by the unanimous approval of the JNC Managers. Following the First Close, any decision to remove either AB or JWP as an Operating Manager shall be made by the unanimous approval of the JNC Managers.

(i)    In the event either AB or JWP is removed as an Operating Manager for Cause, such Person shall be automatically removed as, and cease to be, a Manager.

(ii)    In the event either AB or JWP is removed as an Operating Manager pursuant to this Section 7.3(a), JNC may designate either a JNC Manager or another Person as replacement Operating Manager or elect to have the Company continue with only one Operating Manager.

(iii)    AB and JWP may not be removed as an Operating Manager without Cause.

(b)    A JNC Manager may voluntarily resign as a Manager upon sixty (60) days' notice to all Members of such resignation. In the event one JNC Manager remains after such resignation, JNC may appoint a replacement for such resigning JNC Manager. In the event both JNC Managers resign, JNC may appoint two replacement JNC Managers. Any JNC Manager may be removed at any time by JNC. JNC may, in its sole discretion, appoint a replacement for either or both JNC Managers so removed. Notwithstanding the other provisions of this Section 7.3(b), JNC shall appoint Copelyn and Golding as the JNC Managers as long as they are affiliated with Johnnic Holdings Limited or its Affiliates and the Board of Directors of Johnnic Holdings Limited deems they are capable of representing its interests.

(c)    Each of AB and JWP may voluntarily resign as an Operating Manager of the Company. If either AB or JWP resigns, he shall (i) provide sixty (60) days' notice to all Members of such his intent to resign from the Company and (ii) cooperate fully with his successor such that his responsibilities may be transferred to a successor Operating Manager with as little disruption of the Company's business and affairs as practicable. In the event either AB or JWP resigns as an Operating Manager of the Company, such Person shall also resign as a Manager, so long as such Person is a Member. In the event such resigning Operating Manager ceases to be a Member, such Person shall be automatically removed as, and cease to be, a Manager. In the event either AB or JWP voluntarily resigns as an Operating Manager pursuant to this Section 7.3(c), the remaining Managers may appoint a replacement for such resigning Operating Manager.

(d)    Upon the death or Incapacity of a Manager, such Manager shall cease to be a Manager of the Company. In the event one JNC Manager remains after such death or Incapacity, a replacement for such JNC Manager will be appointed. In the event both JNC Managers die or become Incapacitated, JNC may appoint two replacements for such JNC

-24-

Managers. In the event AB or JWP dies or becomes Incapacitated, the remaining Managers may appoint a replacement for such Manager.

(e)    AB shall remain Chairman as long as he is a Manager. In the event AB ceases to be a Manager, he shall be automatically removed as, and cease to be, the Chairman, and the remaining Managers may appoint a replacement Chairman.

7.4.    Budget. At least thirty (30) days prior to the end of the Company's fiscal year, the Operating Managers shall prepare and submit to the Managers for their review and approval a budget (the "Annual Budget") for the operation of the Company in the next fiscal year. The Annual Budget for the first twenty-four (24) months of operations is attached to this Agreement as Exhibit 7.4 (with service provider draws in the second 12 month period based on the first twelve month period). For purposes of funding the attached Annual Budget, JNC agrees to make quarterly transfers to the Company as indicated on Exhibit 7.4. The Annual Budget shall reflect the amounts necessary to pay compensation and benefits to AB and JWP as reflected in the Compensation Schedule.

7.5.    Major Decisions. Notwithstanding anything else in this Agreement to the contrary, the unanimous approval of the Managers shall be required for the following decisions or actions (each, a "Major Decision"):

(a)    approving the Annual Budget and expenditures that exceed ten percent (10%) of the amounts budgeted therefore in the Annual Budget;

(b)    approving all investment memoranda (each, an "Investment Memorandum"), including the terms and conditions of the purchase of Securities pursuant thereto, and any material amendments thereto, relating to the Company, the Investment Company and all Funds;

(c)    except as specifically provided in the Annual Budget or an Investment Memorandum, appointing new officers and employees the compensation for whom is expected to be excess of $100,000 *per annum*;

(d)    approving the entering into of an employment contract with any person;

(e)    approving increases in compensation and benefits for any Operating Manager;

(f)    other than as specifically authorized in an Annual Budget or Investment Memorandum, selling, disposing or trading, or exchanging Securities and other Company assets;

(g)    borrowing or the issuance of guarantees or pledges by the Company of any money in excess of $100,000.00 or the making by the Company of any loans;

(h)    admitting additional Members (including the terms of their admission) and approving transfers of Members' Interests pursuant to Section 8.5;

(i)     initiating legal proceedings and approving the settlement of any lawsuit or the payment of any indemnification expenses in excess of $50,000.00 pursuant to Section 7.9;

(j)     selecting the Company's accountants and legal counsel;

(k)     issuing a Capital Call Notice for items or expenditures not contemplated under the Annual Budget or investments not contemplated by an Investment Memorandum;

(l)     establishing, increasing, replenishing or decreasing the amount of reserves of the Company;

(m)     causing the Company to dissolve, wind up or liquidate;

(n)     effecting any merger, conversion, consolidation or other reorganization of the Company;

(o)     filing or consenting to the filing of a bankruptcy or insolvency petition, making a general assignment for the benefit of creditors, consenting to the appointment of a trustee or receiver, or otherwise instituting reorganization, insolvency or similar proceedings;

(p)     amending this Agreement or the Certificate of Formation in a manner which may affect the rights or liabilities of the Members;

(q)     entering into any agreement or transaction, or making any payment to, an Affiliate of any Member.

7.6.    Restrictions on the Managers.  Notwithstanding anything in this Agreement to the contrary, no Manager shall, on behalf of the Company, do or permit the occurrence of any of the following acts or things:

(a)     do any act in contravention of this Agreement;

(b)     knowingly perform any act that would subject any Member to liability in any jurisdiction; or

(c)     knowingly perform any act that would create or increase any liability (other than for liabilities provided for herein) for any Member relating to his, her or its interest in the Company.

7.7.    Persons Dealing with Members or Managers.

(a)     Any Person dealing with the Company or any Member may rely upon a certificate signed by a Manager, thereunto duly authorized, as to:

(i)     the identity of the Manager or any Member;

(ii)    the existence or non-existence of any fact or facts which constitute conditions precedent to acts by any Member or in any other manner germane to the affairs of the Company;

-26-

(iii)    the Persons who are authorized to execute and deliver any instrument or document of the Company; or

(iv)    any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member.

(b)    Any documents executed by a Manager while acting in the name and on behalf of the Company shall be deemed to be the action of the Company *vis-à-vis* any third parties (including any Member as a third party for such purpose).

    7.8.    <u>Other Business; Confidentiality, Non-Compete.</u>

(a)    The Members and Managers recognize that the Company is engaged in a competitive business. Accordingly, each Member and Manager agrees that they and their respective Affiliates shall not, directly or indirectly, whether for themselves or for any other person or entity, and whether as a proprietor, principal, shareholder, partner, agent, Member or Manager, consultant, independent contractor or in any other capacity whatsoever, undertake or have any interest in an entity that engages in any business (or any portion thereof) in which the Company is engaged and for which the Members or Managers have rendered services during the term of this Agreement, anywhere within the United States; <u>provided</u>, that such restriction shall not apply to any Member or Manager (including an Operating Manager) if they (and their Affiliates) cease being a Member or Manager, respectively, and, in the case of AB and JWP, if they cease being a service provider to the Company (notwithstanding the fact that they may remain a Member or Manager of the Company). Each Member and Manager agrees and acknowledges that the foregoing limitations in this Section 7.8(a) are reasonable and properly required for the adequate protection of the business and the goodwill of the Company. In the event any such time limitation is deemed to be unreasonable by any court of competent jurisdiction, each Member and Manager agrees to the reduction of such time limitation to such period that such court shall deem reasonable.

(b)    During the term of this Agreement, each Member and Manager shall devote such time and attention to the affairs of the Company as are reasonably necessary to carry out such Member's or Manager's obligations hereunder (including, if applicable, as a service provider to the Company).

(c)    Each Member and Manager shall, at all times during the term of this Agreement and thereafter, except as otherwise expressly provided in this Agreement, use such Member's or Manager's best efforts and take all appropriate steps to safeguard the secrecy and confidentiality of the Company's marketing plans, customer information, specialized information, data bases, financial information and other confidential information regarding the Company and its activities including, without limitation, any information and technology licensed to the Company or developed by any of the Company's employees in connection with the Company's activities after the date hereof; information of the Company which is not generally available to the public and which derives independent economic value, actual or potential, from not being generally known to the public or to other Persons who can obtain economic value from its disclosure or use, including information about clients and prospects; any information concerning the Company's marketing strategy, prospects for new products,

-27-

information system, and process of preparing annual or quarterly reports and annual meeting materials; the contents of any annual or quarterly reports and annual meeting materials; and any budget, internal finance, salary, or other compensation information concerning the Company (the "Confidential Information").  Each Member and Manager agrees as follows:

(i)     Only those employees of the Company, including Members and Managers who need to know the Confidential Information in order to carry out the purposes of the Company, shall have access to the Confidential Information, and such access shall be limited only to so much of the Confidential Information as is necessary for the particular employee to perform his function.

(ii)    No Member or Manager shall disclose (other than in the ordinary course of business), or allow any of such Member's or Manager's Affiliates to disclose, any of the Confidential Information to any third party (whether or not an Affiliate of such Member or Manager) without the approval of the Managers, in their sole discretion.

(iii)   A Member or Manager shall not make use of any of the Confidential Information for any purpose except in furtherance of the business of the Company.  Upon the occurrence of any event that causes a Member or Manager to cease to be a Member or Manager of the Company, such Member or Manager shall return to the Company all originals and copies of any Confidential Information, including in any electronic format, relating to any Confidential Information.

(iv)    This Section 7.8 shall not apply to any Confidential Information which is or becomes generally available to the public under circumstances which do not involve a breach of the terms this Section, or is generally disclosed to third parties by the Company without restrictions on such third parties, or was known to the Member or Manager prior to association with the Company.

(v)     Notwithstanding the foregoing, each Member may disclose information, including Confidential Information, regarding the performance of the Company, the Funds, Pre-Fund Investments, Fund investments and related information (subject to the confidentiality provisions of the Fund Agreements) to their investors or potential investors.

(d)     All written materials, records and documents made by any Member or Manager or coming into any Member's or Manager's possession concerning any products, developments, inventions, processes or any intellectual property used, developed, investigated or considered by the Company shall be the property of the Company, and upon the occurrence of any event that causes a Member or Manager to cease to be a Member or Manager of the

-28-

Company, or upon request of the Company prior to any such event, such Member or Manager shall promptly deliver the same to the Company; provided, that each Member and Manager may keep copies of such materials for the purpose of engaging in the activities described in Section 7.8(c)(v). Each Member and Manager agrees to render to the Company such reports of the activities of the business undertaken by such Member or Manager or conducted under such Member's or Manager's direction as the Company may reasonably request.

(e)     Each Member and Manager shall promptly communicate and disclose in writing to the Company all those inventions and developments, whether or not subject to being protected under copyright, patent or other intellectual property or trade secret protection laws (collectively, the "Developments"), made, conceived, developed or purchased by any Member or Manager or under which any Member or Manager acquires the right to grant licenses or to become licensed, alone or jointly with others, prior to any termination of such Member's or Manager's relationship with the Company, which have arisen or may arise out of such Member's or Manager's association with or services as a Member or Manager to, or relate to any matters pertaining to, applicable to, or useful in connection with, the business or affairs of the Company. All of such Member's or Manager's right, title and interest in, to and under all such Developments, licenses and rights to grant licenses shall be the sole property of the Company. As to all such Developments, each Member or Manager shall, upon request of the Managers, while a Member or Manager or after termination of such Person's relationship with the Company:

(i)     Execute all documents which the Company shall deem necessary or proper to enable it to establish title to such Developments or other rights, and to enable it to file and prosecute applications for letters patent or copyrights of the United States and any foreign country; and

(ii)     Do all things (including the giving of evidence in suits and other proceedings) which the Company shall deem necessary or proper to obtain, maintain or to assert intellectual property rights for any and all such Developments and other rights.

All expenses incident to any action required by the Company or taken on its behalf pursuant to the provisions of this Section 7.8(e) shall be borne by the Company.

(f)     Except upon the dissolution of the Company, without the prior written unanimous consent of the Managers, no Member or Manager shall have a material managerial or investment-related role at any investment company or partnership which makes privately negotiated investments in operating companies located in the United States of America, nor shall any Member or Manager make an investment in the United States of America of a form that any Affiliate of the Company might consider making (e.g., a co-investment or direct investment in a transaction led by a private equity sponsor, other than an Affiliate of the Company, investing in similar situations); provided, however, that the foregoing provision shall not apply to investment in any Successor Funds, any co-investment made by AB or JWP pursuant to Section 7.8, or any investment by a Member or Manager through a blind pool investment vehicle or a discretionary account managed by a Person other than such Member or Manager; provided, further, that such

-29-

restriction shall not apply to any Member or Manager (including an Operating Manager) if they (and their Affiliates) cease being a Member or Manager, respectively, and, in the case of AB and JWP, if they cease being a service provider to the Company (notwithstanding the fact that they may remain a Member or Manager of the Company).

(g)    Each Member and Manager acknowledges that the Company and each Member will be severely damaged by any breach or violation of the provisions of this Section 7.8, and that such damages cannot be adequately compensated by money damages. Accordingly, each Member and the Company shall independently be entitled to equitable relief, including temporary and permanent injunctions, against any actual or threatened breach of Section 7.8 by any Member, or such Member's Affiliates, or any Manager, without the need to post any bond or other security and without having to demonstrate special or unique damages, in addition to all other rights and remedies set forth in this Agreement or available at law or in equity and the breaching Member or Manager shall indemnify the Company and/or enforcing Member for all costs and expenses, including reasonable attorneys' fees, incurred in connection with any action, suit or proceeding to enforce this Section 7.8. In the event a court of competent jurisdiction finds any provision of this Section 7.8 overly broad in scope, the provision so determined shall be deemed reformed to the extent required under applicable law as enforced as so reformed.

(h)    Notwithstanding anything to the contrary in this Agreement, whether express or implied, nothing in this Agreement shall preclude JNC or its Affiliates from making direct investments in the United States in furtherance of or in connection with its business activities as long as such investments are not in or made pursuant to management companies or arrangements or investment programs similar to, or with the same purpose or investment goals as, the Company.

7.9.    Exculpation and Indemnification of Covered Persons.

(a)    Exculpation. Neither the Managers, any Affiliate of the Managers, nor any principal, heir, executor, administrator, partner, member, stockholder, employee, employer, officer, director, manager, agent, successor or assign of any of the foregoing (including any person who serves at the request of the Managers as a director, officer, manager, partner, employee or agent of another entity in which the Company has an interest as a security holder, creditor or otherwise) (each a "Covered Person") shall have any liability to the Company or any Member for any loss suffered by the Company or any Member which arises out of any action or inaction of a Covered Person in connection with the Covered Person's role with respect to the Company, unless such action or inaction by such Covered Person shall have been determined in a judicial proceeding or settlement to constitute fraud, gross negligence, or willful misconduct.

(b)    Indemnification. Subject to the limitations contained in this Section 7.9, the Company shall indemnify each Covered Person against all losses, liabilities, damages and expenses incurred by such Covered Person as a result of any actions or omissions taken or omitted in connection with providing services to the Company or the performance of such Covered Person's duties under this Agreement or by reason of any action or omission taken or omitted on behalf of the Company. Such indemnity shall cover, without implied limitation, judgments, settlements, fines, penalties and counsel fees reasonably incurred in connection with the defense or disposition of any action, suit or other proceeding, whether civil or criminal,

-30-

before or threatened to be brought before any court or administrative body, in which a Covered Person may be or may have been involved as a party or otherwise, or with which it has been threatened, by reason of being or having been a Covered Person, or by reason of any act or omission on behalf of the Company or otherwise taken or omitted in connection with providing services to the Company or the performance of such Covered Person's duties under this Agreement; provided, however, that a Covered Person shall not be entitled to indemnification pursuant to this Section 7.9 with respect to any matter as to which such Covered Person shall have been determined in a judicial proceeding or settlement to constitute fraud, gross negligence, or willful misconduct. The right of indemnification provided hereunder shall not be exclusive of, and shall not affect, any other rights to which any Covered Person may be entitled and nothing contained in this Section 7.9 shall limit any lawful rights to indemnification existing independently of this Section 7.9.

(c)     Payment of Indemnification Expenses. Prior to the final disposition of any claim or proceeding with respect to which any Covered Person may be entitled to indemnification under this Section 7.9, at the Operating Managers' discretion the Company may disburse to the Covered Person, in advance of such final disposition, up to an amount equal to all expenses of said Covered Person reasonably incurred in the defense of said claim or proceeding so long as the Company has received a written undertaking of said Covered Person to repay to the Company the amount so advanced if it shall be finally determined that said Covered Person was not entitled to indemnification hereunder; provided, that no such disbursements shall be made in connection with any claim or proceeding brought by two or more Managers against any other Manager(s).

(d)     Insurance. The Operating Managers, on behalf of the Company, shall cause the Company to purchase and maintain insurance with such limits or coverages as the Operating Managers reasonably deem appropriate, at the expense of the Company and to the extent available, for the protection of any Covered Person against any liability incurred by such Covered Person in any such capacity or arising out of his, her or its status as such, provided such coverages are consistent with the Company's power to indemnify such Covered Person against such liability. The Operating Managers shall purchase and maintain insurance on behalf of the Company for the protection of any officer, director, employee, consultant or other agent of any other organization in which the Company owns an interest against similar liabilities. Any amounts payable by the Company to a Covered Person pursuant to the provisions of this Section 7.9 shall be payable first from the proceeds of any insurance recovery pursuant to policies purchased by the Company pursuant to this Section 7.9(d) and then from the other assets of the Company; provided, that the foregoing shall not affect the Company's obligation to advance expenses pursuant to Section 7.9(c) in circumstances in which the insurance company who has issued such policy will not advance such expenses. The Operating Managers shall use their best efforts to seek reimbursement from any such insurance or any other available sources before making a capital call to fund the indemnification obligation hereunder.

7.10.   Compensation of the Members and Managers. Except as otherwise set forth herein or in the Compensation Schedule, if any, none of the Members or Managers shall be entitled to any compensation for any actions taken with respect to, or on behalf of, the Company

-31-

7.11.  <u>Voting Rights</u>.  Any provision of the Act or this Agreement that requires a vote or consent of the Members shall be read to require the unanimous vote or consent of all of the Common Members.

## SECTION 8.  MEMBERS

8.1.  <u>Admission of New Members</u>.

(a)    Additional Interests may be issued by the Company, and Persons to whom such Interests are issued may be admitted to the Company as a  Member, only upon (i) the unanimous approval of the Board of Managers, and (ii) the execution and delivery of a counterpart to this Agreement, in form and substance satisfactory to the Board of Managers, making such new Member a party hereto.

(b)    Unless otherwise agreed by the Managers, the admission of additional Common Members pursuant to this Section 8.1 shall dilute the Common Interests of AB, JWP, JNC and any other Common Members previously admitted to the Company, pro rata, based on their respective Common Member Percentages. The Schedule of Members shall be amended to reflect a new Common Member's Capital Contribution and Common Member Percentage.

8.2.  <u>Participation in Management</u>.  Except as otherwise provided herein, no Member shall have any right to control or take any part in the management or control of the Company's business.

8.3.  <u>No Authority to Act</u>.  Except as otherwise provided herein, no Member who is not also a Operating Manager shall have any power to represent, act for, sign for or bind the Company or any other Member.  The Members hereby consent to the exercise by the Operating Managers of the powers conferred on them by this Agreement and the laws of the State of Delaware.

8.4.  <u>Death or Disability of a Member</u>.  Upon the death, dissolution, bankruptcy (or occurrence of any event described in Section 18-304 of the Act) of a Member, the affected Member shall cease to be a Member and such Member's interest in the Company shall accrue to the executor, administrator, personal representative, committee, guardian, conservator, trustee or other legal representative or successor of such Member, as applicable, on behalf of such Member or his or her estate (hereinafter "<u>Legal Representative</u>"), which Legal Representative shall have the rights of a transferee as described in Section 8.5.

8.5.  <u>Transfer of Member Interest</u>.

(a)    Except for the transfer of a Member's interest upon the occurrence of an event described in Section 8.4 or by an assignment to a Permitted Transferee, the unanimous written consent of the Board of Managers shall be required for the assignment, pledge, mortgage, hypothecation, sale or other disposition or encumbrance of all or any part, directly or indirectly, of any Member's interest in the Company (collectively, a "<u>Transfer</u>").  The Board of Managers shall not cause or permit interests in the Company to become "traded on an established securities market," and shall withhold their consent to any Transfer that, to the Managers' knowledge after reasonable inquiry, would otherwise be accomplished by a trade on a "secondary market (or the

-32-

substantial equivalent thereof)," in each case within the meaning of Sections 7704 or 469(k) of the Code and any regulations promulgated thereunder that are in effect at the time of the proposed Transfer. Unless otherwise waived in part or as a whole by the Operating Managers (or JNC in the case of a Transfer by AB or JWP), any Transfer of a Member's Interest in the Company which requires the Board of Manager's consent hereunder shall be made only upon reasonable assurances from the transferor and transferee that such Transfer will not result in (i) the Company or the Managers being subjected to any material additional regulatory requirements, or (ii) a violation of applicable law or this Agreement. Except in accordance with the provisions of this Section 8.5(a), each of the Members agrees with all other Members that he will not make any Transfer of all or any part of such Member's interest in the Company. Any Transfer including a Transfer to a Permitted Transferee must comply with the second and third sentences of Section 8.5(a). The transferor shall bear the cost of, including the reasonable expenses of the Company in connection with, any Transfer of its Interest.

(b)     Unless admitted as a substituted Member in accordance with Section 8.5(c), a transferee of an interest in the Company, by assignment, bequest, operation of law or otherwise, shall not be entitled to any of the rights, powers, or privileges of its predecessor in interest, except that such transferee shall be entitled to receive and have allocated to it, to the extent assigned, the distributions and Profit or Loss to which the transferor would be entitled.

(c)     Without the consent of the Board of Managers and, to the extent required, the above-described written opinion of counsel, no transferee of a Company interest shall be admitted as a substituted Member. Subject to the immediately preceding sentence, any transferee of a Company interest transferred in accordance with the provisions of this Section 8.5 shall be admitted as a substituted Member upon the execution of an amendment to this Agreement providing for such admission or upon such later effective date as is set forth in such amendment. To the extent of the interest transferred, such transferee shall succeed to the rights and liabilities of the transferor Member, and the Capital Account of the transferor shall become the Capital Account of the transferee.

(d)     Any attempted transfer of a Member's interest without compliance with this Agreement shall be void. In the event of any transfer which shall result in multiple ownership of any Member's interest in the Company, the Operating Managers may require one or more trustees or nominees to be designated as representing a portion of or the entire interest transferred for the purpose of receiving all notices which may be given, and all payments which may be made, under this Agreement and for the purpose of exercising all rights which the transferor as a Member has pursuant to the provisions of this Agreement. Every transfer shall be subject to all of the terms, conditions, restrictions and obligations of this Agreement.

(e)     A Member may direct that upon his death or Incapacity his Member's interests in the Company shall be transferred and assigned, by gift, to a trust, all of the present beneficiaries of which are members of such Member's immediate family, designated by the Member in a written notice given by such Member to the Company, which trust shall, upon such Member's death or incapacity, have the right to receive any and all distributions accruing to such Member's interest, but, unless admitted as a substituted Member pursuant to Section 8.5(c), shall have no right otherwise to participate in Company affairs or any interest in specific Company property or assets.

-33-

## SECTION 9.  DISSOLUTION, LIQUIDATION AND TERMINATION OF THE COMPANY

9.1.    Events Causing Dissolution.  The Company shall dissolve and its affairs shall be wound up upon the happening of any of the following events:

(a)    the sale or other disposition at one time of all or substantially all the assets of the Company;

(b)    the unanimous agreement of the Board of Managers; or

(c)    the occurrence of any other event causing the dissolution of the Company under the Act.

9.2.    Liquidation.

(a)    Upon dissolution of the Company, the Managers or an authorized liquidating trustee for the Company, if one is appointed, shall commence to wind up the affairs of the Company and to liquidate its assets.  The Managers shall have full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Company assets pursuant to such liquidation for the purpose of obtaining, in its opinion, fair value for such assets, having due regard to the activity and condition of the relevant markets and general financial and economic conditions.  Prior to the distribution of all of the assets of the Company, the business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement.  Proceeds from the liquidation of assets of the Company shall be applied in the following order:

(i)    The expenses of liquidation and the debts of the Company, other than the debts owing to the Members, shall be paid by the Company. Any reserves shall be established or continued which the Managers deem reasonably necessary for any liabilities to be satisfied in the future, for any contingent or unforeseen liabilities or obligations of the Company or for its liquidation. Such reserves shall be held by the Company for the payment of any of the aforementioned contingencies and at the expiration of such period as the Managers shall reasonably deem advisable, the Company shall distribute the balance thereafter remaining as set forth below.

(ii)    Such debts as are owing to the Members shall be paid.

(iii)    The balance, if any, distributed to the Members as follows:

(A)    First, to the Preferred Members, in an amount equal to the unpaid Preferred Return owed to each of them (taking into account previous distributions pursuant to Section 5.3(a)), in proportion to the amounts thus distributable to each;

(B)     Second, to the Preferred Members, until their Unreturned Preferred Capital Contributions Account balances have been reduced to zero, in proportion to the amounts thus distributable to each;

(C)     Third, to the Preferred Members, in an amount equal to the unpaid Preferred Return Gross Up owed to each of them, in proportion to the amounts thus distributable to each;

(D)     Fourth, to the Common Members, until their Unreturned Common Capital Contributions Account balances have been reduced to zero, distributed in proportion to the amounts thus distributable to each;

(E)     Fifth, if the First Close has occurred, to AB and JWP, in accordance with the Sharing Ratio, until AB and JWP have received an amount which in the aggregate is equal to twenty percent (20%) of the JNC Option Value (taking into account previous distributions pursuant to Section 5.3(c)); and

(F)     Thereafter, to the Common Members in accordance with their Common Member Percentages.

(b)     When the Operating Managers or liquidating trustee has complied with the foregoing liquidation plan, there shall be executed and filed an instrument evidencing the cancellation of the certificate of limited liability company of the Company and such other documents as are necessary to effectuate and evidence the termination and dissolution of the Company.

## SECTION 10.     AMENDMENTS

10.1.   Amendments Generally.  In addition to any amendments otherwise permitted by this Agreement, this Agreement may be amended from time to time with the unanimous consent of the Members.

10.2.   Filing Amendments.  The Operating Managers shall, within a reasonable time after the adoption of any amendment to this Agreement (but not longer than the period required by the Act), make any filings or publications if required by the Act or desirable to reflect such amendment.

## SECTION 11.     CONSENTS, VOTING AND MEETINGS

11.1.   Method of Giving Consent.  Any Consent required by this Agreement may be given by:

(a)     a written consent given by the consenting Member or Manager, as the case may be, and received by the Managers at or prior to the doing of the act or thing for which the consent is solicited; or

-35-

(b)    the affirmative vote by the consenting Member or Manager to the doing of the act or thing for which the consent is solicited at any meeting called to consider the doing of such act or thing.

## SECTION 12.    REPRESENTATIONS AND WARRANTIES

12.1.    <u>Representations and Warranties by the Members</u>. Each Member, upon signing this Agreement (or a counterpart hereto), hereby represents and warrants to the Company, as of the date of such signature by such Member that:

(a)    The Interests subscribed for or otherwise acquired by such Member will be acquired for such Member's own account and not with a view to, or intention of, distribution thereof in violation of the Securities Act of 1933, as amended (the "<u>Securities Act</u>") or any applicable state securities laws, and no such Interests will be disposed of in contravention of the Securities Act or any applicable state securities laws;

(b)    Such Member is able to bear the economic risk of his, her or its investment in the Interests for an indefinite period of time because such Interests have not been registered under the Act and, therefore, cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available;

(c)    Such Member has had an opportunity to ask questions and receive answers concerning the terms and conditions of the offering of Interests to such Member, and such Member has had full access to such other information concerning the Company as such Member has requested. Such Member has had an opportunity to consult with counsel and other advisers about an investment in the Interests and that all material documents, records and books pertaining to this investment have, on request, been made available to him, her or it and his, her or its advisers;

(d)    Such Member is an "accredited investor" within the meaning of Section 501 of Regulation D promulgated under the Securities Act;

(e)    Such Member understands that the interests have not been registered under the Securities Act, or the securities laws of any state and, as a result thereof, are subject to substantial restrictions on transfer and understands that (i) the Company has no obligation or intention to register the interests for resale under any federal or state securities laws, or to take any action (including the filing of reports or the publication of information required by Rule 144 under the Securities Act) which would make available any exemption from the registration requirements of such laws. Such Member understands that no federal or state agency has approved or disapproved the interests, passed upon or endorsed the merits of the offering thereof, or made any finding or determination as to the fairness of the interests for investment. Such Member also understands that the interests are being offered and sold in reliance on specific exemptions from the registration requirements of federal and state securities laws and that the Company is relying upon the truth and accuracy of the representations, warranties, agreements, acknowledgments and understandings set forth herein in order to determine the applicability of such exemptions and the suitability of the Member to acquire interests.

12.2.    <u>Representations and Warranties Concerning the Transaction</u>.

(a)     Each of AB and JWP has the legal capacity to execute and deliver this Agreement and to perform his obligations hereunder. This Agreement constitutes the valid and legally binding obligation of each AB and JWP, enforceable in accordance with its terms and conditions.

(b)     Each of AB and JWP holds of record and owns beneficially the membership interests set forth next to his name on the Schedule of Members, free and clear of any restrictions on transfer (other than any restrictions under the Securities Act and state securities laws), taxes, security interests, options, warrants, purchase rights, contracts, commitments, equities, claims, and demands. Neither AB nor JWP are a party to any option, warrant, purchase right, or other contract or commitment that could require AB or JWP to sell, transfer, or otherwise dispose of any membership interest of the Company (other than this Agreement). Neither AB nor JWP are a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any membership interest of the Company.

12.3.   Representations and Warranties of JNC.  JNC represents and warrants to the Original Members that the statements contained in this Section 12.3 are correct and complete as of the date of this Agreement.

(a)     JNC is a corporation duly organized, validly existing, and in good standing under the laws of the Republic of South Africa.

(b)     JNC has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of JNC, enforceable in accordance with its terms and conditions. Except for the South African Exchange Control Authority, JNC need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement.

12.4.   Representations and Warranties Concerning the Company.  The Original Members, jointly and severally, represents and warrants to JNC that the statements contained in this Section 12.4 are correct and complete as of the date of this Agreement.

12.5.   Organization, Qualification, and Power.  The Company is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware. The Company is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required. The Company has full power and authority and all licenses, permits, and authorizations necessary to carry on the businesses in which it is engaged and in which it presently proposes to engage and to own and use the properties owned and used by it. The Original Members have delivered to JNC correct and complete copies of the organizational documents of the Company (as amended to date). The books (containing the records of meetings of the members, the managers, and any committees of the managers and membership interests of the Company) are correct and complete. The Company is not in default under or in violation of any provision of its certificate of formation or this Agreement.

-37-

PHIL1 665104-17

(a)     The Company has no subsidiaries or affiliated companies and does not otherwise own or control, directly or indirectly, any equity interest in any corporation, association or other business entity.  The Company is not a participant in any joint venture, partnership or similar arrangement.

(b)     All of the issued and outstanding membership interests of the Company are held by the Original Members.

(c)     To the actual knowledge of each Original Member, neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Company is subject or any provision of the charter documents of the Company or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Company is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any security interest upon any of its assets).  The Company does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order for the parties to consummate the transactions contemplated by this Agreement.

(d)     To the actual knowledge of each Original Member, the Company has complied with all applicable laws (including rules, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings, and charges thereunder) of federal, state, local, and foreign governments (and all agencies thereof, and no action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice has been filed or commenced against it alleging any failure so to comply.

(e)     To the actual knowledge of each Original Member, neither the Company, nor any of the Original Members (i) is subject to any outstanding injunction, judgment, order, decree, ruling, or charge or (ii) is a party nor is it threatened to be made a party to any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator.

(f)     The Company is not a guarantor or otherwise is liable for any liability or obligation (including indebtedness) of any other person.

## SECTION 13.     MISCELLANEOUS

13.1.  <u>Notices</u>.  Any notice, payment, demand or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be deemed to have been delivered, given and received for all purposes (a) if sent by certified or registered mail, return receipt requested, or by first-class mail, fifteen (15) calendar days after being deposited in the United States or South African mail, postage prepaid, (b) if sent by express mail service, five (5) calendar days after being deposited with such express mail service, postage prepaid, (c) if sent by electronic mail or facsimile transmission, on the date sent, provided confirmatory notice

-38-

is sent by first-class mail, postage prepaid, and (d) if delivered by hand, on the date of receipt, in any such case addressed as follows: if to the Company, to the Company at the address set forth in Section 1.2, or to such other address as the Company may from time to time specify by notice to the Members; if to a Member, to such Member at the address set forth on the applicable Schedule hereto, or to such other address as such Member may from time to time specify by notice to the Company.

13.2.    <u>Use of Company Name</u>. The name "Blue Wolf" is the property of the Company. No Member may use (i) the name "Blue Wolf" or the name of the Investment Company or any Fund, or (ii) any name confusingly similar to a name referenced or described in clause (i) above in connection with or in the name of new business ventures (including a new private equity, mezzanine, debt, real estate or venture capital fund or enterprise or management company), except pursuant to a written license with the Company.

13.3.    <u>Headings</u>. Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

13.4.    <u>Severability</u>. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

13.5.    <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

13.6.    <u>Incorporation by Reference</u>. Every schedule attached to this Agreement and referred to herein is hereby incorporated in this Agreement by reference.

13.7.    <u>Additional Documents</u>. Each Member agrees to perform all further acts and execute, acknowledge and deliver any documents which may be reasonably necessary, appropriate or desirable to carry out the provisions of this Agreement.

13.8.    <u>Counterpart Execution</u>. This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document. All counterparts shall be construed together and shall constitute one agreement.

13.9.    <u>Entire Agreement</u>. This Agreement represents the entire agreement of the Company among the parties hereto governing the subject matter hereof, and supersedes and cancels all prior negotiations, correspondence or agreements, written or oral, among the parties hereto with respect thereto.

13.10.    <u>Board of Director Approval</u>. Notwithstanding anything herein to the contrary, the parties agree and acknowledge that the contemplated terms and conditions and effectiveness of this Agreement are subject to the written consent of the board of directors of Johnnic Holdings Limited.

13.11.  <u>Suspensive Condition</u>.  This Agreement becoming effective, and the transfer of funds as specified in Sections 2.1 and 2.2 and any other transfer of funds contemplated under this Agreement, shall be subject to the satisfaction of any Suspensive Condition.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

-40-

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the day first above set forth.

JOHNNIC HOLDINGS LIMITED

By: _____
Name: M J Cobson
Title: CEO

_____
Adam M. Blumenthal

_____
Josh Wolf-Powers

The undersigned executes this Amended and Restated Limited Liability Company Agreement of Blue Wolf Capital Management LLC only for the purpose of agreeing to the provisions of Section 2.6.

JOHNNIC HOLDINGS LIMITED

By: _____
Name: M J Cobson
Title: CEO

**SCHEDULES OF MEMBERS**
**TO**
**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**BLUE WOLF CAPITAL MANAGEMENT LLC**
**(as of June 14, 2006)**

| Preferred Members | Capital Account Balance for Preferred Interest | Commitment |
|---|---|---|
| Johnnic Holdings Limited | zero | $3,528,922.00 |
| Adam M. Blumenthal | $300,000.00 | zero |
| Josh Wolf-Powers | zero | zero |

| Common Members | Capital Account Balance for Common Interest | Common Members Percentage |
|---|---|---|
| Johnnic Holdings Limited | $765.00 | 51.0% |
| Adam M. Blumenthal | $539.00 | 35.93% |
| Josh Wolf-Powers | $196.00 | 13.07 |
| TOTAL | $1,500.00 | 100.00% |

## SCHEDULE 3.1

*The distribution provision set forth below shall be included in the Investment Company Agreement, subject to such modifications as may be agreed to by the Company, JNC, AB and JWP. Definitions of capitalized terms used in this Schedule 3.1 not otherwise defined in this Agreement are defined below.*

## Distribution Provision:

Except with respect to any tax distributions to be made to the members of the Investment Company, all distributions by the Investment Company shall be made as follows:

(a)     First, one hundred percent (100%) to the Funding Member, in an amount equal to the unpaid IC Preferred Return owed to the Funding Member;

(b)     Second, one hundred percent (100%) to the Funding Member until the Funding Member's IC Unreturned Capital Contributions Account balance has been reduced to zero;

(c)     Third, one hundred percent (100%) to the Managing Entity until the Managing Entity receives an amount which, if distributed by the Managing Entity to the Preferred Members, would equal the unpaid Preferred Return owed to the Preferred Members;

(d)     Fourth, one hundred percent (100%) to the Managing Entity until the Managing Entity receives an amount which, if distributed by the Managing Entity to the Preferred Members, would reduce the Preferred Members' Unreturned Preferred Capital Contributions Account balances to zero;

(e)     Fifth, one hundred percent (100%) to the Managing Entity until the Managing Entity receives an amount equal to the amounts listed as the Capital Account balances of the Common Members of the Company as of April 1, 2006 (but giving credit for the amounts contributed by JNC pursuant to Section 2.1 after this date), on the Schedule of Members of the Company;

(f)     Sixth, if the First Close has occurred, one hundred percent (100%) to the Managing Entity until the Managing Entity receives an amount which, if distributed by the Managing Entity to AB and JWP, would equal twenty percent (20%) of the JNC Option Value (which has not otherwise been distributed to AB and JWP);

(g)     Seventh, one hundred percent (100%) to the Carry Members until the Carry Members have been allocated under this paragraph (g) in the current and all prior fiscal years, twenty (20%) percent of the cumulative distributions paid to the Funding Member pursuant to paragraph (a) and made or being made pursuant to this paragraph (g); and

(h)     Thereafter, seventy-nine percent (79%) to the Funding Member, twenty percent (20%) to the Carry Members in accordance with the Sharing Ratio, and one percent (1%) to the Managing Entity.

The Carry Members' respective Carry Percentages shall be subject to vesting in accordance with the Vesting Schedule. In the event any Pre-Fund Investments are transferred to the First Fund, any and all Carry Distributions attributable to such Pre-Fund Investments shall be extinguished, and the carried interest provisions of the First Fund shall apply instead; provided, however, that the Carry Distributions shall survive to the extent, if any, that the Pre-Fund Investments are transferred at a booked-up gain which is not received in cash at such time. If a Carry Member is removed for Cause, the Common Members shall have the right to purchase his Vested Percentage at fifty percent (50%) of its fair market value as determined in accordance with Section 3.7(c).

The Investment Company may first make tax distributions to the Carry Members to permit the Carry Members to pay Federal, state and local income taxes resulting from allocations of income and gain from the Investment Company. Tax distributions, if any, will be calculated using the maximum marginal income tax rates applicable to individuals residing in New York, New York in effect at the time such distribution is made. Such tax distributions will be applied against amounts otherwise to be received by the Carry Members.

**Definitions:**

"Carry Distributions" means the distributions described as made "to the Carry Members" in subsections (g) and (h) of the Distribution Provision set forth above.

"Carry Members" mean AB and JWP, and any successors or assigns thereto.

"Carry Percentage" means that percentage of Carry Distributions payable to either AB or JWP, as applicable, in accordance with the Sharing Ratio.

"Funding Member" means JNC or any Affiliate of JNC permitted by the Managers to invest in place of JNC.

"Managing Entity" means the Company or, if formed, a Capital Company.

"IC Preferred Return" means, as of any calculation date, an eight percent (8%) annual return (or such higher rate that is set forth in any Fund Agreement), on the Funding Member's IC Unreturned Preferred Capital Contributions Account balance (computed from time to time to reflect additions to or reductions of such IC Unreturned Preferred Capital Contributions Account balance).

"IC Unreturned Preferred Capital Contributions Account" means a memorandum account maintained for the Funding Member reflecting the portion of the Funding Member's commitment to the Investment Company which is contributed to the Investment Company, reduced by the Funding Member's share of distributions made pursuant to paragraph (b) above.

"Unvested Percentage" means that portion of the Carry Members' Carry Percentage equal to one minus their respective Vested Percentage.

"Vested Percentage" means that portion of the Carry Members' Carry Percentage that has vested in accordance with the Vesting Schedule.

"Vesting Schedule" means the following schedule upon which AB's and JWP's Carry Percentage vests: (i) twenty-five percent (25%) upon the execution of this Agreement and (ii) the remaining seventy-five percent (75%) shall vest in 16 equal quarterly installments on the first day of each fiscal quarter, beginning with the first full fiscal quarter after the execution of this Agreement provided, that all distributions and allocations shall be made as if AB and JWP had fully vested unless and until a forfeiture of an Unvested Percentage reduces the distributions and allocations to the forfeiting Member. Upon the forfeiture of either AB's or JWP's Unvested Percentage, the Unvested Percentage and related allocations of the forfeiting Member shall be reallocated to the other Carry Member of the Investment Company (unless such Member has become a Departing Member prior thereto, in which case the Unvested Percentage shall be reallocated to JNC).

## SCHEDULE 3.2

*The distribution provision set forth below shall be included in any Fund Agreement, subject to such modifications as may be agreed to by the Company, JNC, AB and JWP and limited partner investors in such Fund. Definitions of capitalized terms used in this Schedule 3.2 not otherwise defined in this Agreement are defined below.*

### Distribution Provision:

Except with respect to any tax distributions to be made to the partners of the Fund, all distributions by the Fund shall be made as follows:

(a)     First, one hundred percent (100%) to the partners, in an amount equal to the unpaid Fund Preferred Return owed to the partners, distributed to each partner pro rata in proportion to the amount of each partner's unpaid Fund Preferred Return;

(b)     Second, one hundred percent (100%) to all partners in proportion to their respective unreturned capital contributions, until the partners receive one hundred percent (100%) of their unreturned capital contributions;

(c)     Third, one hundred percent (100%) to the general partner until the general partner has received under this paragraph (c) in the current and all prior fiscal years twenty percent (20%) of the cumulative distributions pursuant to paragraph (a) and made or being made pursuant to this paragraph (c); and

(d)     Thereafter, (A) eighty percent (80%) to the partners in accordance with their respective partner's percentages and (B) twenty percent (20%) to the general partner.

The rights of the Carry Members to receive their Carry Distributions shall be subject to vesting in accordance with the Vesting Schedule. If a Carry Member is removed for Cause, the Common Members shall have the right to purchase his Vested Percentage at fifty percent (50%) of its fair market value as determined in accordance with Section 3.7(c).

### Definitions:

"Carry Members" mean AB and JWP, and any successors or assigns thereto.

"Carry Distributions" means the distributions described as made in subsections (c) and (d)(B) in the Distribution Provision set forth above.

"Carry Percentage" means that percentage of Carry Distributions payable to either AB or JWP, as applicable, in accordance with the Sharing Ratio.

"Fund Preferred Return" means, as of any calculation date, an eight percent (8%) annual return (or such other return as is negotiated among the general partner and investors in such Fund), on the partners' unreturned capital contributions.

"Unvested Percentage" means that portion of the Carry Members' Carry Percentage equal to one minus their respective Vested Percentage.

"Vested Percentage" means that portion of the Carry Members' Carry Percentage that has vested in accordance with the Vesting Schedule.

"Vesting Schedule" means the following schedule upon which AB's and JWP's Carry Percentage vests: (i) twenty-five percent (25%) upon the execution of the relevant Fund Partnership Agreement and (ii) the remaining seventy-five percent (75%) shall vest in 16 equal quarterly installments on the first day of each fiscal quarter thereafter; provided, that all distributions and allocations shall be made as if AB and JWP had fully vested unless and until a forfeiture of an Unvested Percentage reduces the distributions and allocations to the forfeiting Member. Upon the forfeiture of either AB's or JWP's Unvested Percentage, the Unvested Percentage and related allocations of the forfeiting Member shall be reallocated to the other members of the general partner in proportion to their (indirect) interests in the Carry Distributions.

## EXHIBIT 7.4

2006 Budget

**[Attached]**

## Schedule of Compensation

This schedule sets forth the terms and conditions of AB's and JWP's compensation during the period of their provision of services to the Company.

1.  <u>Compensation</u>. During the Services Period, (x) AB shall receive a base amount ("<u>Base Amount</u>") at an annual rate of $300,000.00 per year, and (y) JWP shall receive a base amount (also, a "<u>Base Amount</u>") at an annual rate of $200,000.00 per year, in each case payable in arrears every two weeks. No less than annually during the Services Period, the Board of Managers shall review AB's and JWP's performance and base amount over the prior twelve (12) month period. Such evaluation shall take into account all relevant facts and circumstances including, without limitation, (i) the success of the business activities of the Company; (ii) the performance of similarly sized private equity funds in the United States of America engaging in investments similar in nature and size; and (iii) the average annual increase of compensation of similarly situated investment professionals at similarly sized private equity funds in the United States of America, as reported by publicly available sources. Thereafter, the Board of Managers in its reasonable discretion, may increase but not decrease AB's and JWP's Base Amount. "<u>Services Period</u>" means the period commencing on the Effective Date and ending on the date on which AB or JWP, as applicable, is terminated for Cause, dies, becomes Incapacitated or otherwise is no longer an Operating Manager.

2.  <u>Additional Payments</u>. In addition to their Base Amount, AB and JWP shall be eligible to receive: (i) on or prior to the termination of the Original Term, a cash payment computed and payable as provided in paragraph 2(a) below (the "<u>Milestone Payment</u>"), and (ii) beginning with the first (1st) Renewal Term (and for every calendar year for the remainder of the Services Period), an annual cash payment computed and payable as provided in paragraph 2(b). "<u>Original Term</u>" means the period commencing with the Effective Date and ending on the second (2nd) anniversary of the Effective Date.

    (a)    The Milestone Payment shall be equal to [[A]*[B*2]], where "<u>A</u>" equals a percentage, not less than sixty percent (60%) and not more than one-hundred and twenty percent (120%), that shall be determined by the Board of Managers (excluding AB or JWP, as applicable,) in its reasonable good faith discretion, and "<u>B</u>" equals AB's or JWP's Base Amount at the time of the First Close (the "Performance Milestone"). The Milestone Payment shall be payable as follows:

        (i)    if the Performance Milestone is achieved on or prior to the first (1st) annual anniversary of the Effective Date, fifty percent (50%) of the Milestone Payment shall be payable in 2007, but no later than the first (1st) annual anniversary of the Effective Date, and the remaining balance of the Milestone Payment shall be payable in 2008, but no later than the termination of the Original Term; and,

        (ii)    if the Performance Milestone is achieved after the first (1st) annual anniversary of the Effective Date and on or prior to the termination of the Original Term, (A) a pro-rata portion of the Milestone Payment (equal to [A*[B/24]], where "<u>A</u>" equals the Milestone Payment, and "<u>B</u>" equals the number of whole months (rounded up for a part of a month) between the Effective Date and the day on which the Performance

Milestone shall have been achieved) shall be payable concurrently with the then next scheduled installment payment of AB's or JWP's Base Amount, and (B) the remaining balance of the Milestone Payment shall be payable in 2008, but no later than the termination of the Original Term.

(b)     Beginning with the first (1st) Renewal Term (and for every calendar year for the remainder of the Services Period), AB and JWP shall be entitled to receive an annual payment (the "<u>Annual Payment</u>") equal to [[A]*[B]], where "<u>A</u>" equals a percentage, not less than sixty percent (60%) and not more than one-hundred and twenty percent (120%), and "<u>B</u>" equals the AB's or JWP's Base Amount at the time such payment is calculated. "<u>A</u>" shall be determined by the Board of Managers (excluding AB or JWP, to the extent the decision is being made regarding their payment) in good faith based upon the performance of the Company over the first Renewal Term through December 31, 2008, and over each calendar year for the remainder of the Services Period thereafter (the first Renewal Term through December 31, 2008, and each such subsequent calendar year, an "<u>Annual Performance Period</u>"), against performance target(s) established by the Board of Managers (excluding AB or JWP, to the extent the decision is being made regarding their payment) no later than (as applicable) thirty (30) days prior to the commencement of the first Renewal Term and each subsequent Annual Performance Period ("<u>Annual Performance Targets</u>"). The Annual Performance Targets shall be communicated to AB or JWP, as applicable, in writing prior to the commencement of the relevant Annual Performance Period, and shall be based upon criteria established by the Board of Managers in its reasonable good faith discretion. The Annual Payment shall be payable to AB or JWP concurrently with the next scheduled installment payment of AB's or JWP's Base Amount following the date on which the Annual Payment has been earned and computed, but in no event later than December 31st of the applicable Annual Performance Period; <u>provided</u>, that AB's or JWP's Annual Payment for 2008 shall be pro-rated.

3.     <u>Participation in Plans</u>. In addition to AB's or JWP's Base Amount, the Milestone Payment and the Annual Payment, AB or JWP, as applicable, shall receive following during the Services Period (and thereafter to the extent provided herein). AB and JWP shall receive customary vacation, holiday and sick leave days and benefits that may be generally offered by similarly-situated companies to similarly-situated investment professionals, including, without limitation, participation by AB or JWP, as applicable, and, where applicable, AB's or JWP's dependents, in the various health, disability and life insurance benefit plans or programs, and receive parking and/or transportation reimbursement, as generally provided to similarly situated investment professionals, subject to the satisfaction of the eligibility requirements with respect to each of such plans or programs. However, nothing in this paragraph 3 shall prohibit the Company from making any changes in any of the plans, programs or benefits described herein, provided such changes apply to all similarly situated investment professionals of the Company.

4.     <u>Option Grant</u>. On the date hereof, Johnnic Holdings Limited ("<u>Johnnic</u>") shall grant, or shall cause the JNC Incentive Share Trust to grant, (x) to AB an option (the "<u>Option</u>") to acquire 733,333 shares of Johnnic's ordinary shares at an exercise price ("<u>Price</u>") equal to the value of Johnnic's stock on the date of the grant (determined by the average of its prices at the close of regular trading on the Johannesburg Stock Exchange for the 30 days prior to the grant) and (y) to JWP an Option to acquire 266,667 shares of Johnnic's ordinary shares at an exercise price equal to the Price. The other terms of the Option shall be as set forth in the governing plan

document (the "Option Plan"), and Johnnic/JNC Incentive Share Trust shall grant an option award to, or enter into a grant agreement with, AB or JWP, as applicable, which option award or grant agreement shall be in form and substance reasonably acceptable to AB or JWP, as applicable. Each Option shall irrevocably vest and become immediately exercisable according to the following schedule: (i) forty percent (40%) immediately following the First Close; (ii) an additional twenty percent (20%) on the first (1st) anniversary of the First Close; (iii) an additional twenty percent (20%) on the second (2nd) anniversary of the First Close; and (iv) the remaining twenty percent (20%) on the third (3rd) anniversary of the First Close. Each Option grant provided for in this paragraph 4 is made as an inducement essential to AB's or JWP's entering into this Agreement. For purposes of the Option grant, Proposed United States Treasury Regulation Section 1.409A-1(b)(5)(iii)(D) shall apply such that the language "at least 20 percent" is used instead of "at least 80 percent" at each place it appears in United States Treasury Regulation Section 1.414-(c)(2), as permitted under such proposed regulation.

5.      All compensation paid pursuant to paragraphs 1-4 above of this Schedule of Compensation shall be treated as guaranteed payments to a partner of a partnership under Section 707(c) of the Code.

BLUE WOLF

## Exhibit 7.4

| | Year 1 | Year 2 |
|---|---|---|
| *Revenues* | | |
| Fund management fees | 0 | 0 |
| Organizational expense reimbursement | | 627,000 |
| Transaction fees for completed transactions, net | 90,000 | 180,000 |
| Portfolio company management fees, net | 0 | 40,000 |
| Total revenues | 90,000 | 847,000 |
| | | |
| *Expenses* | | |
| Placement fee | 0 | 0 |
| | | |
| Dead deal expenses | 50,000 | 50,000 |
| | | |
| *Salaries* | | |
| Adam Blumenthal | 300,000 | 300,000 |
| Josh Wolf-Powers | 200,000 | 200,000 |
| Associate | 75,000 | 100,000 |
| Analyst 1 | 18,750 | 75,000 |
| Analyst 2 | 0 | 37,500 |
| Office manager | 100,000 | 100,000 |
| Assistant/bookkeeper | 0 | 0 |
| Total salaries | 693,750 | 812,500 |
| | | |
| Fringe | 92,000 | 130,295 |
| 401k | 0 | 0 |
| Non-officer bonus | 25,000 | 0 |
| Total personnel before officer bonus | 810,750 | 942,795 |
| | | |
| *Office expenses* | | |
| Rent | 120,000 | 123,600 |
| Electric/etc. | 9,000 | 9,270 |
| Telephone | | |
| Landline | 12,000 | 12,360 |
| Cell/data | 7,200 | 10,197 |
| Computers/ISP/web hosting | 24,000 | 24,720 |
| Postage/FedEx | 9,600 | 13,200 |
| Subscriptions | 45,000 | 46,350 |
| Copier lease | 5,000 | 5,150 |
| Catering | 5,000 | 5,150 |
| Office supplies | 4,000 | 4,120 |
| Other | 9,000 | 9,270 |
| IT lease expense | 7,050 | 8,460 |
| Total office expenses | 256,850 | 271,847 |
| | | |
| *Professional services* | | |
| Legal, Consulting | 75,000 | 77,250 |
| Accounting | 15,000 | 15,450 |
| PR | 0 | 0 |
| Total professional services | 90,000 | 92,700 |
| | | |
| *Marketing/Deal Generation* | | |
| Travel | 89,000 | 91,670 |
| Entertainment | 12,000 | 12,360 |
| Conferences/Memberships | 25,000 | 25,750 |
| Total Marketing/Deal Generation | 126,000 | 129,780 |
| | | |
| Franchise/other taxes | 20,000 | 20,600 |
| D&O insurance | 20,000 | 20,600 |
| Total franchise/other taxes & D&O insurance | 40,000 | 41,200 |
| | | |
| Total set-up costs | 364,750 | 262,250 |
| Total operating expenses (before bonus) | 1,738,350 | 1,790,572 |
| | | |
| EBITDA before bonus | (1,648,350) | (943,572) |
| Bonus | | 908,077 |
| EBITDA | (1,648,350) | (1,851,650) |
| Depreciation and amortization (IT lease depreciation) | | |
| EBIT | (1,648,350) | (1,851,650) |
| Net interest expense (IT lease interest) | (2,289) | (2,336) |
| Pre-tax income before organizational expenses | (1,646,061) | (1,849,314) |
| Taxes | | |
| Net income | (1,646,061) | (1,849,314) |

BLUE WOLF

Exhibit 7.4

|  | Scheduled Draws | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | Year 1 | | | | Year 2 | | | |
|  | Day 1 | Day 91 | Day 181 | Day 271 | Day 1 | Day 91 | Day 181 | Day 271 |
| Draw amount | 674,604 | 339,170 | 339,170 | 385,406 | 617,777 | 390,932 | 390,932 | 390,932 |

[Johnnic Holdings Limited Letterhead]

June __, 2006

Adam M. Blumenthal
324 West 23rd Street
New York, New York 10011

Josh Wolf-Powers
413 6th Street
Brooklyn, New York  11215

Dear Mr. Blumenthal and Mr. Wolf-Powers:

Johnnic Holdings Limited ("JNC") hereby agrees to the following:

1.      use its best efforts to appoint Adam M. Blumenthal to the Board of Directors of JNC by no later than December 31, 2006; and

2.      to issue options to purchase one million (1,000,000) shares of JNC common stock to Adam M. Blumenthal and Josh Wolf-Powers in proportions to be agreed upon by them at an exercise price per share pursuant to JNC's standard policy.

JOHNNIC HOLDINGS LIMITED

_____
Name:

Title:

W729253.1